## Albert Wiley v. Keokuk.

1. Practice—Jurors—Talesmen—*Peremptory challenges.* A person who had served as a talesman in the trial of a cause at the same term of the court, was placed on the regular panel in place of a juror excused. He was challenged by defendant, because of his previous service as talesman. The court overruled the challenge, and he was then challenged peremptorily. *Held:* That the court erred in overruling the challenge; but inasmuch as the record does not show that the defendant exhausted his peremptory challenges, the judgment will not be reversed for an error which was cured by the action of the defendant.

2. Issues—*how determined.* The issues in a cause are those certain points controverted by the pleadings; and such issues only are to be submitted to a jury.

3. ——*Pleadings—Answer—construction of.* Whatever is admitted in a special defense operates, so far, as a modification of a "general denial," and is to be taken as true, without other proof.

4. ——*Instructions to jury.* It is not error to charge that an illegal act has been committed by the defendant, when the answer of the defendant admits facts that show he did certain acts which must be held illegal.

Damages, *in Assault and Battery False Imprisonment, etc.* It is not error to charge the jury that they are authorized to give exemplary damages, where the elements of fraud, malice, gross negligence, or oppression, mingle in and form part of the cause of action.

### *Error from Douglas District Court.*

Action for assault and battery, and false imprisonment, brought by *Keokuk*, chief of the Sac and Fox Indians, as plaintiff. The action was instituted against *Albert Wiley*, Charles E. Mix, Thomas Murphy, Thomas Dorwin, and William P. Montgomery, and subsequently dismissed as to all except *Wiley*. The body of the petition was as follows:

"The said plaintiff complains of said defendants, for that the said defendants, on the 23d of November, 1868, at Lawrence, in the county of Douglas, unlawfully, and with force, assaulted the said plaintiff, and beat, bruised, wounded, and ill-treated him, and then and there imprisoned him, and kept and detained him in prison in the county jail of Douglas county, amongst a lot of thieves, and other vile characters, without any reasonable or probable cause whatever, for the space of one night and two days next following, and other wrongs then and there did to the said plaintiff, to the damage of the said plaintiff, ten thousand dollars."

*Wiley* answered, setting up two defenses—first, a general denial, and second, a special statement of facts as and for a justification. The second defense was stated as follows:

"II.–And for a second and further defense, the defendant says, that on and prior to the 23d of November 1868, he was the United States Indian Agent for the Sac and Fox Indians in the State of Kansas, and for a long time previous thereto he had acted as such; that the said plaintiff is one of the Indians of said tribe, and pretends to be a chief of said Indians, and on said 23d of November, and for a long time previous thereto, resided on the lands of said tribe, in the county of Franklin, in the State of Kansas; that on or about the 26th of October 1868, this defendant as such Indian Agent received from the said Thomas Murphy, then the United States Superintendent of Indian Affairs in the State of Kansas, an order of which a copy is hereto attached marked "A;" that with said order he received a copy of an order given by Charles E. Mix, who was then the acting commissioner of Indian Affairs for the United States, which order is dated October 16th 1868, and a copy thereof is hereto attached marked "B;" that by the terms of said order, this defendant, as such Indian Agent, was required to prevent any Indians of said tribe visiting Washington, D. C.; that on or about the 16th of said November, this defendant caused the above mentioned orders to be read to the plaintiff, and other Indians of said tribe; that on or about the 19th of said November, this defendant

·informed said Murphy that said plaintiff with others contemplated visiting the city of Washington in violation of the order of the said Charles E. Mix above mentioned, and the said Murphy, then being such superintendent of Indian Affairs, did then order and require this defendant in case said plaintiff should leave the Reserve of said Indians, in said county of Franklin, for the purpose of going to Washington to cause him to be arrested and put in jail, or returned to his Reservation; that on or about the 22d of said November this defendant was informed that said plaintiff, with others, had left said Reserve, and was then in the city of Lawrence, on his way to the city of Washington, D. C., in violation of said order above mentioned; that this defendant on said day went before said William P. Montgomery, who then was the United States commissioner for the District and State of Kansas, and made an affidavit in writing, a copy of which is hereto attached marked " C;" that on the same day he gave his testimony as a witness on the hearing of said complaint before said commissioner against the said plaintiff.

"And defendant says, that the above is a full statement of all that this defendant had to do with said plaintiff, or the arrest, assault, or imprisonment of said plaintiff; that this defendant did not arrest, touch or imprison said plaintiff, or in any manner interfere with him; and all he did in the premises, was strictly in accordance with the instructions and orders he had received as above mentioned, and which this defendant as an officer of the United States was bound by law to obey."

Exhibit " B," Mix's " order," mentioned in said answer, omitting date, names, etc., is as follows:

" Sir : I have to advise you that as Congress failed to make certain appropriations from which the expenses of delegations of Indians visiting this city have heretofore been paid, no delegation from any of the tribes in your superintendency will be allowed to visit this place during the present fiscal year, unless specially directed to do so by this office, for the reason that there are no funds at the disposal of the Department that can be used to defray their necessary expenses.

"You will inform the different agents under you of the foregoing, and take such other steps to prevent any Indians coming here, as may be necessary to accomplish the object."

And *Wiley's* affidavit (Exhibit "C,") made for the arrest of *Keokuk*, is as follows:

[VENUE.] "The complainant, Albert Wiley, of Franklin county, upon being duly sworn, says, that Keokuk, a Sac and Fox Indian, late of the Sac and Fox reserve, in said district, heretofore, to-wit, on the 22d of November, 1868, at said reserve, in said district, did leave said Sac and Fox reserve, and did disobey the orders of the United States Commissioner of Indian Affairs, and the orders of other agents of the United States, to him given, contrary to the laws of the United States in such case made and provided. Wherefore," etc.

A jury was called to try the action. Walter Willis, one of those called, was challenged for cause. The disposal of the question of challenge, and the subsequent proceedings, are fully stated in the opinion of the court.

On the trial it appeared that upon Wiley's affidavit, U. S. Com'r Montgomery issued a warrant for the arrest of Keokuk, which process was executed by Thomas Dorwin, a deputy U. S. marshal; that an examination was had before Montgomery; that Wiley employed counsel, directed the course of the prosecution, and testified as a witness in support thereof; that Keokuk was required to give bail for his appearance at the U. S. District Court, and in default thereof was committed to jail, a *mittimus* being issued therefor. On the part of the defense all the papers mentioned were offered in evidence, and received without objection.

Certain instructions, to which defendant Wiley excepted, are set forth in the opinion of the court. The jury found for the plaintiff, Keokuk, and assessed his

damages at one thousand dollars, for which judgment was entered, and Wiley brings the case here for review.

*Riggs, Nevison & Foote*, for plaintiff in error:

1. The court erred in overruling the challenge to the juror Willis. Willis had served already on one jury at that term, as a talesman, and was incompetent when challenged for that cause; § 270, Civil Code. Nor has the party waived the error. The doctrine of the case of *Morton v. The State*, 1 Kas., 468, is not applicable. The law has been changed since that decision was given. It is now made the duty of parties to *first complete* their challenges for *cause*, before resorting to peremptory challenges. Gen. St., p. 681, § 271.

2. It was error to give the *sixth* instruction, to-wit, that " The letter of Commissioner Mix, does not justify " the *illegal* act of Agent Wiley. He is answerable in " damages to the plaintiff for any illegal act."

This is clearly improper. The court cannot assume to state what facts existed; he can only inform the jury what would be the law governing a certain state of facts. All the averments of the petition were denied by the answer. Whether any or all of these allegations of the petition were true or false, were exclusively questions of fact for the jury, and it was the exclusive duty and province of the jury to determine the truth or falsity of each and all of said allegations. Broom's Legal Maxims, 45; *Johnson v. Sutton*, 1 T. R., 544; *Masten v. Deyo*, 2 Wend., 424; *Ash v. Marlow*, 20 Ohio, 119. "It is an error in the court to assume to find a disputed fact." *Gray's Adm'rs v. Allen*, 14 Ohio, 58. And *Horne v. The State*, 1 Kas., 42, fully sustains this view.

3. It was also error to give the *seventh* and *eighth*

instructions, to-wit: "7th.—Whenever the elements of "fraud, malice, gross negligence or oppression mingle in "the controversy, the law allows the jury to give what is "called exemplary or vindictive damages. 8th.—In cases "of torts, and actions for false imprisonment, the jury "are the only proper judges of how much the plaintiff "ought to recover."

These charges were calculated to mislead the jury. There is no averment in the petition of malice, fraud, or gross negligence. If the facts alleged were true, the plaintiff would be entitled to the actual damages he had sustained, and no more; and every dollar that the jury should give him, after compensating him for such damages, would be legalized robbery. But it is said that exemplary damages are allowed as a punishment for the wrong committed. We answer, that if the allegations of the petition are true, then the defendant was liable to be tried for the criminal offense charged in the petition, and fined or imprisoned, or both; and in this way he would be properly punished. *Austin v. Wilson*, 4 Cush., 274; *Thorley v. Lord Kerry*, 4 Taunt., 355; *Whitney v. Hitchcock*, 4 Denio, 461; *Taylor v. Carpenter*, 2 Woodb. & Min., 1, 22; 14 Ind., 479; Hilliard on Torts, 444–5.

In *Malone v. Murphy*, 2 Kas., 250, which was for malicious prosecution, the petition charged that the act was done "maliciously" and "without probable cause." A person may be liable in damages for malicious prosecution, and not liable to be criminally prosecuted. *Malone v. Murphy* does not in any manner bear on this case; for in the case at bar, the plaintiff in error is charged with an assault and battery, false imprisonment, etc., and is liable to be criminally prosecuted for the same.

4. The instructions asked by plaintiff in error, (being

the converse of the instructions complained of,) stated the correct rule, and should have been given.

5. The verdict is against the evidence, and contrary to law, and should have been set aside.

6. The verdict and judgment should have been in favor of the defendant below. The letter and instructions of Commissioner Mix, and orders of Supt. Murphy, were full and complete authority to *Wiley* for all that he did in the premises. The plaintiff below was an *Indian*, and as such, was subject to the power and right of the United States to make such regulations for his government, as the President of the United States should deem proper, and for the interest of the tribe to which he belonged; or, in other words, Keokuk was then a *ward* of the government, and if the government should think it for the interest of Keokuk, or his tribe, to restrain him from going to Washington, it had a clear right so to do. See laws of the United States, and treaties made with the various tribes of Indians. 1 Brightly's Digest, p. 426, §§ 1, 8, 10, 17, 18, 25, 52, 62, 69, 102, 111.

*James Christian*, for defendant in error:

1. The error, if any, in overruling the challenge of the juror, was cured by the defendant himself. He removed Willis from the jury, by a peremptory challenge, and did not exhaust the number of such challenges allowed him by law. *Morton v. The State*, 1 Kas., 468.

2. The letter or circular of Commissioner Mix, was no protection to Wiley in the trespass complained of. The power to issue such an order does not exist in the Commissioner of Indian Affairs, nor any other officer of this government. It is not among any of the powers of the Executive Department of this government. And

even though the order in question was approved by the Secretary by the Interior, (as is alleged,) or by the President himself, it was in flagrant violation of law, and is void.    Conklin on Executive Powers, pp. 64, 65, 67; 2 Cranch, 170.

But it is contended that Wiley acted in good faith, and therefore is excusable in the matter of damages for doing what it might seem was his duty.  Good faith is no excuse for a violation of the statutes, and ignorance of the law is no defense.    All are bound to know the law.    "And the court cannot sanction the doctrine that the President is invested with a dispensing power which has no countenance for its support in any part of the constitution." 12 Peters, 613.

" To enter a man's house by virtue of a *nameless warrant*, is a most daring attack upon the liberty of the subject." *Beardsmore vs. Carrington,* 2 Wilson, 206.

3. That the defendant in error is an *Indian* makes no difference; his right to personal liberty and personal security in a government of law, is as great as that of the President, or any other citizen.    Vattel's Law of Nations, § 4, Preliminaries.  He cannot be deprived of his rights without his consent.

The defendant in error, although an Indian, a member of his tribe, born out of the limits of any of the States, not a citizen of or owing allegiance to the United States, is still a *man,* a member of the great family of nations, and entitled by the laws of nature, reason and humanity to go when and where he pleases, so that he does not interfere with the rights of others.    He has the right to travel in any part of his Great Father's earthly dominions where his desires or necessities require, being *unarmed and willing to pay his own expenses,* from the fact

of his being a MAN. " Sir," said Black Hawk, the famous
Sac and Fox Chief, when a prisoner, and reproved by
President Jackson for bringing on the war in 1831,
" Sir, you are a man; so am I. But fortune has placed
us in different circumstances. Your people are stronger
than mine. You can dictate your terms; I am your
prisoner, and must submit. But I am still a man, as
well as you."

This manhood argument is no new idea—it has been
the chief argument of man since the earliest ages. 2
Kings, viii, 13; 1 Samuel, xvii, 43. And earlier still, it
was said, "Let us make man in our image, after our
likeness." Genesis, i, 26.

4. As to *Damages.* This man Keokuk is a prince
among his people—a chief, or sachem. He is the repre-
sentative man of his nation. His position and standing
is a legitimate fact to be taken into consideration in
ascertaining the amount of damages he is entitled to
recover. The action is *ex delicto,* for a tort, a wrong, or
injury to the person, wherein we claim exemplary dama-
ges, on the ground that there was malice and oppres-
sion in the trespass complained of. Wiley admits in his
answer that he made the affidavit that caused the plaintiff
to be arrested; that he gave evidence against him on the
examination. He employed counsel to prosecute for the
alleged offense, on the preliminary farce, and before the
district judge, on the *habeas corpus;* and he is liable to
respond in exemplary damages. Sedg. on Dam, 35.

I beg to call attention to a few cases found in the
books, where juries, exercising the powers intrusted to
them by the law, have rendered verdicts that have stood
the test of judicial investigation, and the sanction and
approval of mankind; In *Beardmore v. Carrington,* the

jury gave £1,000 damages for six days' detention in a private house. In *Huckle v. Money*, 2 Wils., 205, the jury gave £300 for six hours' imprisonment. In *Leeman v. Allen*, 2 Wils., 160, the jury gave £300 damages for two hours' restraint on the street and in a private house. In none of these cases was the plaintiff stigmatized by being put into the common prison, like a murderer or a thief. In *Merrest v. Harvey*, the jury gave £500 damages in trespass; *Bruce v. Rawlins*, £500, 3 Wils., 60, for searching his house; *Redshaw v. Brook*, searching for run goods, £200 damages were given; *Grey v. Sir Alexander Grant*, a little assault and battery, £200 were allowed; *Wilford v. Berkley*, £500; *Hewlett v. Crouchy*, 5 Taunton, 277, an arrest, on a false charge, of a few hours, £2,000 damages were allowed. And not one of these cases was set aside as being excessive.

There was no error in the instructions given, and none in refusing those asked by defendant below.

The opinion of the court was delivered by

KINGMAN, C. J.: The first error alleged occurred in selecting a jury. The juror was challenged for cause, on the ground that he had once already served on a jury as a talesman on the trial of a cause at the same term of the court. The court overruled the challenge. This was error. Civil Code, § 270. It appears that after the juror had served as a talesman, he had been called to serve as a regular juror for the term, in place of a juror excused. This made no difference. The law remained the same; the challenge should have been allowed. The beneficent objects of the section could not be frustrated by placing a man on the regular panel who could not serve on a jury if challenged. The object of

1. PRACTICE. Challenge of juror; § 270 of civil code construed;

the law is to get rid of professional jurors, a most pestiferous set, as every lawyer knows; and this could not be done away with by a sheriff or court, by putting such a juror on the regular panel. The juror was afterwards — but act of challenged peremptorily by plaintiff in error, party will cure the error. and thus removed from the jury. The record does not show that the defendant exhausted his peremptory challenges. These facts bring the case directly within the ruling of this court in the case of *Morton v. The State*, 1 Kas., 468. " By this means the defendant seems effectually to have relieved himself from the grievances of which he complained;" and the case will not be reversed for an error of the court which the party cures by his own action.

II. The next error claimed is, that the court erred in the charge to the jury; and special attention is called to 2. Issues: What, the sixth instruction, which is as follows: and how determined. " That the letter of instruction of commis- " sioner Mix, does not justify the *illegal* act of agent " Wiley. He is answerable in damages to the plaintiff " for any illegal act." The plaintiff in error claims that by this instruction the court told the jury that Wiley did do some act to Keokuk; and that such act was illegal, end that the letter of commissioner Mix did not justify such illegal act. It is apparent from the record that the court did do just what it is claimed that it did. The indication of the court is too plain not to have been understood by the jury. Did the pleadings and evidence authorize such an instruction? The jury are only to pass upon the issues made up in the case. They pass upon the controverted facts; that is, the facts controverted by the pleadings. In this case the petition alleged an assault and battery, and false imprisonment. The

answer set up two grounds of defense, *first*, a general
denial, and *second*, a special defense showing what the
defendant had really done, and attempting to justify his
acts by these facts. This second defense was an admis-
sion that the defendant was the primary moving cause of
the arrest and imprisonment of the plaintiff, and an
attempt to justify his conduct therein. Now, notwith-
standing the general denial, we suppose that whatever

3. ANSWER: Ef-
fect of admis-
sions on gener-
al denial;

was admitted in the special defense need not
have been proved. This special defense so far
modified the general denial that whatever was
admitted therein was excepted from the general denial.
It ought to be so, on general principles of pleading. It
must be so, inasmuch as it is a formal confession of the
existence of the facts therein set forth. A careful exam-
ination of the answer has convinced us that, had there been
no evidence in the case the court would have had to give
nominal damages at least, on the pleadings, as they stood;
and to do so, would necessarily have held that in the
answer there was an admission of facts which made the
defendant guilty of an illegal act in causing the arrest and
imprisonment of Keokuk. The court then committed

4.——no error
to treat facts
admitted, as
facts proven.

no error in telling the jury, as it did, that
Wiley had been guilty of an illegal act towards
the plaintiff; and, of course, there can be no
justification in law for an illegal act. Where there is
justification in law, there is no illegality. As the plead-
ings had admitted the acts done, it was proper for the
court to so say to the jury; and it was its duty to say to
them that such acts were illegal, if such was the law.

Nor do we think this ruling is at all in conflict with
the case of *Carl Horne v. The State*, 1 Kas., 42, to which
we have been referred. The plea of *not guilty* in that

case put everything in issue, and it was necessary for the State to prove every fact essential to make up the crime; and every such fact was to be passed upon by the jury, unbiassed by anything the court might say. In this case it was the duty of the court on the pleadings to say that the judgment must be for the plaintiff, and it was proper to say so to the jury; and the court did no more at most, in the instruction under consideration.

III. The seventh and eighth instructions are objected to. They are as follows; 7th.—" Whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy, the law allows the jury to give what is called exemplary or vindictive damages." 8th.—" In cases of torts, and actions for false imprisonment, the jury are the only proper judges of how much the plaintiff ought to recover."

5. DAMAGES. Exemplary, when allowed;

These instructions raise the question, so much discussed of late by writers upon law, as to whether such damages as are called exemplary, vindictive or punitive ought ever to be allowed. We content ourselves with following the current of authorities, and decide that the instructions go no further than such authorities warrant. If the law is wrong, let the law-making power correct it. The rule as laid down by the court below has already received the sanction of this court.—*Malone v. Murphy,* 2 Kas., 250. The whole subject is discussed *pro* and *con*, and the authorities referred to, in 2 Greenleaf's Ev., § 253, and note, and §§ 254, 255; and Sedg. on Damages, 4th Ed., p. 533, and note. And after all this discussion, the Supreme Court of the U. S. decide the law as laid down in these instructions. Mr. Justice Grier, delivering the opinion of the court well says: " If repeated judicial decisions for more than a century are to be received as

the best exposition of what the law is, the question will not admit of argument. By the common as well as by statute law, men are often punished for aggravated misconduct, or lawless acts, by means of a civil action, and the damages inflicted by way of penalty or punishment, given to the party injured." We have no doubt that such is the law. Whether it be founded in sound reason or not, is not so much our province to say, as to determine if it be law. The writer hereof believes it to be not

*— principle approved;* only good law, but founded on sound principles, and beneficial in its application. It often furnishes the only restraint upon a bad man, who cares little for his neighbor's character, his person, or his property. The party injured pursues the wrong-doer to punishment, when society is too careless to do so.

It is claimed however, in this case, that the action being for assault and battery, which is punishable by criminal proceedings, if exemplary damages are allowed then the wrong-doer is liable to be punished twice. To this, two answers may be made, each of which is satisfactory. While the action is for assault and battery and false imprisonment, the evidence only showed a false imprisonment; and the plaintiff fails to show how that is

*— even if party is liable to criminal prosecution.* made a criminal offense. Second, the great weight of authorities is against such a modification of the doctrine. In Massachusetts, Indiana, and North Carolina, such limitation has been engrafted upon the doctrine of exemplary damages; but in most of the states it has been rejected, and we think rightfully.

These reasons render it unnecessary to consider at length the instructions asked by the defendant and refused, for they are the direct converse of those given,

asking the court to say that the jury could only give a verdict for the damages sustained, or "actually sustained." The petition contained the usual averments formerly found in actions for assault and battery, and false impris-onment, and the jury were authorized under it to give exemplary damages. As we understand the law, the instructions asked laid down a much more limited rule, and consequently ought not to have been given.

IV.   On a motion for a new trial it was insisted that the verdict was against the law and the evidence; and two reasons are urged in support of the position.   First: That the evidence did not show a state of facts that would authorize a recovery against Wiley.   Let us see:   Wiley was agent for the Sac and Fox Indians, of which tribe Keokuk was chief.   Com-missioner Mix had directed that no delegation from any of the tribes should visit Washington, as there was no appropriation to pay their expenses.   This letter, as was one from Superintendent Murphy, was read by Wiley to Keokuk, and others, on the 16th of November, 1868. Keokuk said he should go, as he had money and would pay his own expenses.   On the 22d of November, Keokuk and four others of the tribe, started for Washington, without license so to do.   They were overtaken by Wiley, at Lawrence, on the next day.   Wiley on that day went before a United States Commissioner for the district of Kansas, and made a complaint in writing, under oath, charging " that Keokuk a Sac and Fox Indian, of the Sac and Fox Reserve, in the county of Franklin, in the district and State of Kansas, did on the 22d of Novem-ber, 1868, leave said reserve, and did disobey the orders of the United States Commissioner of Indian Affairs, and the order of other agents of the United States to him

*Facts of the case discussed.*

given," and asking that Keokuk be apprehended and dealt with according to law. On this affidavit a warrant was issued, and Keokuk arrested by the United States Marshal and brought before the Commissioner. Wiley employed counsel, and testified in the case; and thereupon the commissioner decided that Keokuk should give bail for his appearance at the next term of the United States Court for the District of Kansas, and directed the marshal to take him into custody. Keokuk refused to give bail, and was taken to jail, and kept there till he was released upon *habeas corpus.*

This is a sufficient outline of the testimony in the case to understand what is deemed necessary to say on the point under consideration. The complaint made by Wiley charges no offense on the part of Keokuk; neither did the warrant or mittimus describe any offense known to the law. The substance of the complaint is stated above, and the warrant and mittimus generally follow it; though in this case the mittimus is more verbose, as though the commissioner felt it necessary to say something more than that Keokuk had left the Reserve and was traveling to Washington, to justify his act in sending him to jail. Still, no offense is charged known to any system of laws of which we have any knowledge. The facts are so barren as not to lay the foundation for jurisdiction. The affidavit, warrant, and mittimus afford ample evidence that no criminal charge was preferred, or passed upon, nor a sufficient pretense of one to challenge judicial discretion; and this conclusion sweeps away the ground on which the decisions rested, to which the plaintiff in error refers in his brief.

The second reason urged why the verdict should have been set aside is, that " the plaintiff below was an Indian,

" and as such was subject to the power and right of the
" United States to make such regulations for his govern-
" ment as the President of the United States should deem
"proper, and for the interest of the tribe to which he
" belonged ; or, in other words, Keokuk was then a ward
" of the government, and if the government should think
" it for the interest of Keokuk, or his tribe, to restrain
" him from going to Washington, it had a clear right so
" to do." We are not prepared to give our sanction to
the doctrine above set forth; but might well do so, and
not disturb the action of the court below, for we are
nowhere shown any law of the United States, or any
regulation of the President, that makes it a punishable
offense for an Indian to go to Washington at his own
expense. Nor does the letter of the commissioner, or
superintendent. But we suppose that nothing but a law
would avail as a justification for arresting and imprison-
ing a man. If it is necessary to elucidate this point, then
indeed have we learned little of the principles of a gov-
ernment professedly based on law. Nor does it make
any difference that the party injured is an Indian, whether
he be regarded as " a ward of government," or as belong-
ing to a " domestic dependent nation," or " a distinct
independent political community, retaining their original
natural rights"—to each of which classes they have at
times been assigned by the language of the Supreme
Court of the United States. In any view, while keeping
the peace, and disobeying no law, human or divine, he
cannot be the subject of arrest or imprisonment by any
one, except at the peril of the offender. His rights are
regulated by law, and when he appeals to the law for
redress, it is not in the power of any tribunal to say, "you
are an Indian, and your rights rest in the arbitrary
decrees of executive officers, and not in the law."

We shall not disturb the decision of the court below for the reasons assigned, and having examined the record, and all the alleged errors, and finding no reason to reverse the judgment of the court below, the same will be *affirmed*.

SAFFORD, J., concurring.

.VALENTINE, J.: I agree with the court upon all questions of law, and of fact, in this case, except, that I do not think that the *answer* of the defendant Wiley, in the court below, bears the construction put upon it by this court.