No. 18,492.

JOSEPH B. STALKER, *Appellee,* v. D. D. DRAKE, *Appellant.*

SYLLABUS BY THE COURT.

1. ACTION—*Petition for Willful and Malicious Oppression—Not for a Conspiracy.* The petition herein interpreted and held to state a cause of action for willful and malicious oppression by the defendant, acting through his agents, in seeking to enforce usurious and unlawful claims against plaintiff, and should not be regarded as one asserting a liability on the ground of the conspiracy of the defendant with his agents as tort-feasors and coconspirators.

2. ——— *Same.* Where a party makes an unlawful demand against another and maliciously and oppressively uses the machinery of the courts and the process of the law as well as other measures in an endeavor to enforce the payment of such demand the injured party is entitled to recover the loss and damage resulting from such wrongdoing.

3. EXEMPLARY DAMAGES — *For What Purpose Allowed.* Exemplary damages are not allowable because of any special merit in plaintiff's case, but are imposed by way of punishing the defendant for an invasion of the plaintiff's rights in cases characterized by malice, fraud or a willful and wanton

disregard of the rights of others, and it is held that the elements justifying the allowance of such damages are present in this case.

Appeal from Wyandotte court of common pleas; HUGH J. SMITH, judge. Opinion filed December 6, 1913. Modified.

*Edwin S. McAnany, Maurice L. Alden, Nathan Cree,* all of Kansas City, and *R. J. Ingraham,* of Kansas City, Mo., for the appellant.

*L. W. Keplinger,* of Kansas City, *T. J. Madden,* and *E. A. Scholer,* both of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action by Joseph B. Stalker against D. D. Drake to recover damages for alleged willful, wanton and malicious oppression. The record discloses that the appellant was a money lender and had a chain of offices over the country with headquarters at Kansas City, the Kansas City office being managed by an agent named Van Zandt. Drake's residence appears to have been at Delaware Water Gap, Pa. The appellee was a railway employee, and had been employed by a number of railway companies in various capacities, as freight brakeman, conductor, switchman and yardmaster. In May, 1903, while employed by the St. Louis & San Francisco Railroad Company as conductor the appellee applied to the office of Drake, managed by Van Zandt, for a loan of $25. He signed two papers without reading either of them. One was a note and the other an assignment of his wages. The loan was to run for a period of one month and Stalker was to pay $2.50 for the use of the money. He renewed the note the following month on the payment of an additional $2.50. He endeavored to again renew it in July, a day or two after it became due, and was informed that the matter had been placed in the hands of

an attorney and that it would cost him $10 more to straighten the matter out. Under protest this amount was added to the amount of the note and another $2.50 paid by Stalker as interest. In September, when the loan again became due, Stalker had not received his pay check, and upon inquiry was told that an extension of a few days would be given and when the pay check was received he was then informed that another $10 from him would be necessary to get the matter out of the hands of another attorney with whom the note had been placed; and after considerable controversy he signed a note for $45, paid $3.50 as interest, and agreed to pay $4.50 for the next month. In October, on account of the derailment of a train, Stalker was a few days late in tendering payment of the interest, and he was then informed that the claim was in the hands of an attorney and that suit had been brought upon it, but Van Zandt would not give him the name of the attorney or of the court. They insisted on adding $10 for attorneys' fees and $5 for court costs and the note was thereby increased to $60. He continued to pay $6 a month on this amount until February, 1905. In the meantime he had borrowed $30 additional and this amount was repaid at the end of the month, including interest thereon at ten per cent per month. In February, 1905, Van Zandt notified Stalker that the account would have to be finally settled the following month. Stalker not being able to pay the claim and thus protect his railroad record resigned his position with the railroad company. Later, and about May or June, 1905, he secured employment from the Chicago & Alton Railroad Company as night yardmaster. The controversy with Van Zandt as to the payment of the loan still proceeded, and being pressed for payment of all that was claimed Stalker filed a voluntary petition in bankruptcy, which resulted in a discharge, and in the proceeding the debt to Drake was scheduled at $66. In February, 1906, one of the blank assignments which

Stalker had signed when the loans were renewed was filled out by Van Zandt and filed with the Chicago & Alton Railroad Company at Chicago, and thereafter the payment of Stalker's wages was withheld. A suit was begun there by Drake to recover on his claim, which had suddenly grown to $140, and Stalker, to protect his interests, made several trips to Chicago, and finally a nonsuit was taken. This, however, did not operate to release Stalker's wages because of the assignment which had been filed. He was reduced from the position of yardmaster to that of foreman and from that of foreman to helper, and in November, 1909, he felt compelled to resign his position. Stalker, at that time, had received the original loan of $25 and $30 at another time and had already paid Drake $145.50, but only $30 of the amount paid had been credited on the principal indebtedness, and Stalker had therefore paid $115.50 for the use of $25 from May, 1903, to February, 1905. On September 6, 1906, Drake brought a second action in Chicago and this time he asked judgment for $200 on what had been a $25 loan. Several continuances were had at the instance of Drake which necessitated several trips to Chicago by Stalker. A trial was finally had and a judgment in favor of Stalker was rendered. No appeal was taken from this judgment by Drake, and although judgment had been rendered against him for the costs of the depositions taken by Stalker, a demand for the payment of this amount was refused. Another of the blank assignments that had been given before the judgment against Drake was rendered was filled out and filed with the railroad company in Chicago. On its face it purported to have been given after the judgment and constituted a new claim against Stalker's wages. Stalker then brought this action, in which Drake and Van Zandt were both named as defendants, but Van Zandt died and an amended petition was filed against Drake alone in which these and other facts

10—91 KAN.

were stated at length.  It is alleged that the illegal and oppressive measures were used by Drake in and out of court through a spirit of malice and revenge, with a view of coercing and making Stalker pay illegal demands, and that Stalker had thereby been deprived of his wages, had suffered for the necessities of life and been compelled to pay sums of money for lawyers' fees, expenses of litigation and other purposes, and he therefore asked for both actual and exemplary damages. The trial resulted in a verdict in favor of Stalker for $1000 as actual and $5000 as punitive damages.

It is contended that no recovery can be had because of the lack of legal evidence of conspiracy.  The appellant assumes that the action is one to recover damages for a conspiracy between appellant and his agents, and that as there is a lack of proof to show combination, concert of action, a unity of design and a common purpose of all to do the unlawful acts, no recovery can be had.  There is nothing substantial in this contention. The action is not grounded on the conspiracy of Drake and his agents as tort-feasors, but is the ordinary one, asserting a liability for the wrongs of appellant accomplished by himself directly and through his agents. The word "conspiracy" is used in the petition where it is alleged that Drake, knowing that appellee was dependent upon his salary, and that the filing of an assignment with the railroad company and the beginning of suits against appellee would stop the payment of his wages, prevent promotion in the railroad service, and jeopardize his position, and knowing also that the claim against appellee was illegal and extortionate and could not be collected by legal means, that he and his agent brought suits away from Kansas City and in Chicago, remote from appellee's residence, filing assignments, obtaining continuances and resorting to other dilatory tactics, and when a final adjudication was rendered against appellant that he still continued to file assignments and to make threats of other litigation, and that

all these acts were parts of one systematic scheme, plan and conspiracy of oppression and fraud carried out by appellant and his agents to coerce appellee into paying a fraudulent claim. It was evidently the purpose of the pleader to state a liability of appellant for wrongs done by him through his agents, as well as by himself, and not to assert a liability against the agents as tort-feasors and coconspirators. The word "conspiracy" was manifestly used in the sense of scheme or system of wrongdoing devised and carried out by appellant, and the recovery is only sought on the ground that he is responsible for acts done by himself and also by his agents within the scope of their agency.

The argument that a cause of action is not stated in the petition can hardly be seriously made. It certainly states good ground for recovery for both actual and punitive damages, and it would be a reproach upon the law if it did not afford a remedy for the willful and malicious acts of oppression and coercion recited in the petition.

It is also contended that the award of $1000 as actual damages is not supported by the evidence nor yet by the special findings. The injuries about which testimony was given would have afforded a basis for a much larger award, but there are reasons for the contention that the findings do not warrant the amount awarded as actual damages. In answer to special questions, the jury found that appellee was entitled to recover $75 for loss of time, $20 for attorneys' fees in the first suit brought before a justice of the peace in Chicago, $18 for the expense of depositions, $25 for attorneys' fees in the second suit at Chicago, $100 for attorneys' fees in a suit at Kansas City, and $10 for procuring surety bonds in the litigation with appellant. Then the question is asked, "If you allow any other sum as actual damages, state for what said actual damages are allowed," and it is answered, "Railroad, hotel and incidental expenses, $200.00." The items of damage, ex-

cluding the last one mentioned, amount to $248, and the sum of all other actual damages is placed by the jury at $200. This last sum, together with those first named, amounts to $448, and under the language of the findings that must be the limit of recovery for actual damages. A much larger allowance might have been made for attorneys' fees, as there was testimony that for certain litigation growing out of the wrongs of appellant $200 would have been reasonable for the services rendered. However, it is not included in the findings of the jury, and the form of the findings is such as to negative an intention to include it in the general verdict. The injury to the standing of appellee with his employer and coëmployees, the humiliation, worry and loss occasioned by the withholding of his wages and the distress and loss resulting from the nagging, coercive measures and litigation brought against him which is disclosed by the evidence, and if the witnesses had named the pecuniary loss sustained by appellee for these causes a much larger award would have been warranted. There is abundant evidence, we think, to sustain the award of the items first mentioned as actual damages. Some complaint is made, however, that the evidence does not sustain the finding of the award of $200 for railroad, hotel and incidental expenses. The term "incidental" as ordinarily used and applied to expenses includes a variety of things. No request was made to have the jury specify or definitely state the things included in the term, and in the absence of such request we are not disposed to place any narrow construction upon the finding.

It is urged that there is no ground for the allowance of exemplary damages, and that, in any event, the award is so large as to indicate passion and prejudice on the part of the jury. The punitive damages were fixed at the sum of $5000. It is argued by appellant that this award was necessarily the result of unreasoning hostility of the jurors against usury and their re-

Stalker v. Drake.

sentment against appellant as a usurer. The charges made for the use of the money, although extortionate and unconscionable, are not the grounds upon which punitive damages were allowed. Appellee may not be entitled to much sympathy for the excessive rate of interest which he paid, because when the loan was effected he voluntarily undertook to pay a rate of ten per cent per month. . In his behalf it is said that he was a stranger in Kansas City, unacquainted with appellant's system, and in his ignorance found it necessary to pay what the appellant demanded. The interest, although one hundred and twenty per cent per annum, is only a small part of the unlawful claim which appellee was pressed to pay. The loan was increased, as the testimony shows, by various devices, such as fabricated attorneys' fees and pretended court costs, so that in a few months a loan of $25 had become a claim for $200, notwithstanding that the appellee in the meantime had paid appellant $115.50 in an effort to discharge the debt. The means used to enforce the payment of the unconscionable demand betrayed wantonness and malice. Appellant knew of the straightened circumstances of appellee, and of the rule of the railway company that an assignment of an employee's wages was a ground for his discharge from service, and having secured a number of blank assignments from appellee, held them over his head, driving him to the signing of notes for larger sums and the payment of $6 per month for the use of the $25 loan. These assignments, being executed in blank, were filled in by appellant for such times and amounts as he saw fit. When appellee's necessities were great and he concluded to raise and pay the amount of the last note, although extortionate, in order to release his wages which had been tied up by an assignment, his offer was met by demand of appellant for the payment of $140, and Van Zandt, the agent of appellant, said to him that if his baby was in a dangerous condition, as appellee had

represented, he should pay the $140 and obtain a release of his wages. When appellee protested against such an exorbitant demand, Van Zandt replied that appellee had caused appellant (who was a millionaire and employed attorneys by the year) a great deal of trouble, and that appellant was going to make an example of appellee. When reminded that appellee had obtained a discharge in bankruptcy, and also that the claim of appellant was not enforceable because of usury, Van Zandt said he understood these points, but that they proposed to go ahead in the use of the methods they had been employing to compel payment. On another occasion he said to an attorney of appellee that they had appellee tied up, that a man of his means could not afford to fight, that continuances would be taken and costs made which appellee could not meet, and urged these reasons to the attorney why appellee should pay the demand. The shifting from state to state, the use of the machinery of the courts, and the abuse of its process in the effort to enforce the demand, the bringing of the actions in distant places, and the use of dilatory tactics in such litigation, all calculated to exhaust the resources of appellee and force him to pay the unjust demand, afforded abundant grounds for the award of punitive damages. Such damages are allowable not because of any special merit in the plaintiff's case, but are imposed by way of punishing the defendant for malicious, vindictive or a willful and wanton invasion of the plaintiff's rights, the purpose being to restrain him and deter others from the commission of like wrongs. Such damages are only given where malice, fraud or a willful and wanton disregard of the rights of others enter into the case. The elements justifying such an award are certainly present in this case, and having in mind the purpose for which they are allowed, we can not say that the award is excessive or that it indicates passion and prejudice on the part of the jury.

We find no error in the instructions of the court, nor any ground for reversal, but the judgment of the trial court will be modified, awarding actual damages in the sum of $448, making the total award for both purposes $5448. The judgment, so modified, is affirmed.