(650 P.2d 729)
No. 53,978

GARY SLOUGH, d/b/a SLOUGH CONSTRUCTION COMPANY, and NORTH-WEST TRENCHING AND BACKHOE, INC., A Kansas Corporation, *Plaintiffs-Appellees,* v. J. I. CASE COMPANY, A Delaware Corporation, *Defendant-Appellant,* and PRICE BROTHERS EQUIPMENT, INC., a Kansas Corporation, and DANA CORPORATION, a Virginia Corporation, *Defendants.*

Opinion filed September 2, 1982.

*Selby S. Soward,* of Goodland, for appellant.

*Ronald S. Shalz,* of Colby, for appellees.

Before REES, P.J., SPENCER and MEYER, JJ.

MEYER, J.: This is a civil case, sounding in contract and tort. Plaintiff Gary Slough, d/b/a Slough Construction Company, and Northwest Trenching and Backhoe, Inc. (appellees; for simplicity reasons, hereinafter referred to as appellee), brought this action against defendants J. I. Case Company, Price Brothers Equipment, Inc., Dana Corporation and Tractech, Inc. The petition alleged breaches of express warranties, implied warranties of merchantability and of fitness for a particular purpose, against all defendants. It also alleged negligence against all defendants. In addition, it alleged fraudulent concealment, and gross and wanton conduct against defendant J. I. Case Company. At the close of trial, the case was submitted to the jury on the theories of breach of implied warranty of merchantability as to all defendants, and of fraudulent concealment, and gross and wanton conduct as to J. I. Case Company. The jury returned a verdict in favor of appellee

and against J. I. Case Company, only, on all questions; the jury awarded actual damages of $55,500 and punitive damages of $350,000. J. I. Case Company (appellant) appeals from this verdict.

It is noted that while appellee initially filed a cross-appeal, this was later voluntarily dismissed on motion of appellee.

On August 15, 1979, appellee purchased a Model DH-7 trencher, a heavy implement. This particular machine was manufactured by appellant on July 24, 1979. It was sold to appellee by defendant Price Brothers Equipment, Inc. The purchase price was in excess of $37,700.

In approximately three months of normal operation, appellee's DH-7 suffered no less than ten axle failures. Each of these resulted in financial hardship to appellee.

The axles used in appellee's DH-7 were model R-9000 axles, manufactured by the Dana Corporation. Appellant conducted no tests on the torque-generating capability of the DH-7 prior to placing it on the market. It was only after several axle failures that appellant finally conducted testing to determine such capability. These tests were conducted in early May of 1979, and involved a fully operational DH-7. These tests showed that the DH-7 would produce a continuous torque load of 9,000 foot-pounds, with peak loads of up to 12,000 foot-pounds. At approximately this same time, appellant was informed by Dana Corporation that, on the basis of the latter's testing, the R-9000 axle could be expected to fail at a torque load of 6,980 foot-pounds. The combined import of these two sets of tests was to clearly show that, in normal operation, a typical DH-7 could produce torque loads almost double what the R-9000 axles could withstand.

Appellant's own internal memoranda show that at the time appellee's DH-7 was manufactured, appellant knew, on the basis of this stress testing, that the R-9000 axle would not withstand the amount of torque which would be placed upon it during normal operation of the DH-7. Upon making this discovery, appellant nevertheless continued to manufacture and market the DH-7 with the R-9000 axles; appellant also instituted a program of on-site replacement of the "no-spin" differential in the DH-7 with "limited-slip" differentials. While this modification reduced the incidence of axle failure, it also admittedly diminished the working capabilities of the DH-7. It was also shown that, following the

torque testing, Dana Corporation withdrew any and all approval of the use of R-9000 axles in the DH-7.

The evidence showed that at no time did appellant inform either its own dealers or its customers of the relevant facts, above-detailed, concerning the inadequacy of the R-9000 axles.

There was also evidence to show that when appellant did perform on-site modifications to appellee's DH-7, it represented that it had replaced both front and rear differentials as per its program, when in fact only one of the two differentials had been so replaced. Both plaintiff Gary Slough and salesman Leon Magner, representing defendant Price Brothers Equipment, Inc., felt they had been lied to in this connection.

It was undisputed that appellee's DH-7 was manufactured after appellant had notice of the inadequacy of the R-9000 axle. Internal documents of appellant corporation show that it made a conscious decision to withhold knowledge of this inadequacy from dealers and customers, for obvious business reasons. There was little dispute that the DH-7 sold to appellee was not merchantable, as defined by K.S.A. 84-2-314.

The jury held for appellee on the issue of implied warranty of merchantability. It also determined that appellant's conduct amounted to fraudulent concealment, and a gross and wanton neglect of duty, such as to evidence reckless indifference to the rights of others. On its verdict, the jury awarded both actual and punitive damages. Appellant challenges this verdict based on alleged erroneous admission of expert opinion and the propriety and excessiveness of punitive damages.

Appellant contends the trial court erred in allowing admission, over objection, of certain opinion testimony by appellee's expert witness, Dr. Ronald Wells.

Appellant bases this issue on its argument that appellee's witness, Dr. Ronald Wells, was not shown to be qualified as an expert in certain areas, but that the court nonetheless allowed him to express his opinion in such areas. Particularly, appellant challenges the foundation for opinions relating to the alleged inadequacy of the test procedures employed by appellant to evaluate the torque-generating capabilities of the DH-7 with the R-9000 axle, and to the propriety of appellant's decision to continue manufacturing and selling the DH-7 with R-9000 axles after the

results of such tests, and of those conducted by Dana Corporation, were known.

Dr. Wells expressed his opinion that appellant's torque-generating test, which involved a fully operational DH-7 was inadequate in that it did not subject the vehicle to the same degree of stress as would be expected from normal operation. He based this opinion on the fact that during this test, the DH-7 was operational only on a flat, hard-packed surface, and also that the torque loads this produced were instantaneous in nature, not of sufficient duration to cause axle failure. He also stated that the decision to continue production of the DH-7, without any modifications, after these tests showed the axles to be inadequate to their task, was "ridiculous."

Appellant argues that while Dr. Wells is indeed a qualified expert in the field of metallurgy, he was not shown to have a knowledge of the manufacture, sale or operation of an implement such as the DH-7. Thus, appellant argues, Dr. Wells' opinion testimony should have been limited to whether suitable materials and processes were utilized in the production of the R-9000 axle. Appellant made a timely and specific objection to Dr. Wells' proffer, so this point is properly brought on appeal. See K.S.A. 60-404.

The admissibility of opinion testimony is governed by K.S.A. 60-456. The pertinent portions of that statute provide:

"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness.

"(c) Unless the judge excludes the testimony he or she shall be deemed to have made the finding requisite to its admission.

"(d) Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of fact."

In a recent opinion of the Kansas Court of Appeals, the rules relating to the admissibility of the testimony of expert witnesses were reviewed.

"An expert witness must have skill or experience in the matter to which the subject relates. *In re Central Kansas Electric Coop., Inc.*, 224 Kan. 308, 319, 582 P.2d 228 (1978). In considering whether to admit the opinion of an expert witness, the trial court is to consider the education, training, experience and knowledge of the witness. *Nunez v. Wilson*, 211 Kan. 443, 445, 507 P.2d 329 (1973). The

qualifications of an expert witness and the admissibility of his testimony are within the sound discretion of the trial judge. *Plains Transp. of Kan., Inc. v. King,* 224 Kan. 17, 21, 578 P.2d 1095 (1978). A trial court has wide discretion in determining whether it will receive opinion evidence. An abuse of discretion must be found in order to reverse the trial court on the admission of expert testimony. *Lindquist v. Ayerst Laboratories, Inc.,* 227 Kan. 308, Syl. ¶ 3, 607 P.2d 1339 (1980)." *U.S.D. No. 490 v. Celotex Corp.,* 6 Kan. App. 2d 346, 363, 629 P.2d 196 (1981).

Certain holdings by the Supreme Court of Kansas also illuminate this area in the law of evidence.

"The test of competency of an expert witness is whether he discloses sufficient knowledge of the subject of inquiry to entitle his opinion to go to the jury, and the question of the degree of his knowledge goes more to the weight of his testimony than to admissibility." *Ziegler v. Crofoot,* 213 Kan. 480, Syl. ¶ 4, 516 P.2d 954 (1973).

Also see *Lollis v. Superior Sales Co.,* 224 Kan. 251, Syl. ¶¶ 1, 2, 580 P.2d 423 (1978), where the court held:

"Under K.S.A. 60-456 the opinion testimony of experts on the ultimate issue or issues is not admissible without limitation. Such testimony is admissible only insofar as the opinion will aid the jury in the interpretation of technical facts or when it will assist the jury in understanding the material in evidence."

"The basis for the admission of expert testimony is necessity, arising out of the particular circumstances of the case. Where the normal experience and qualifications of laymen jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are inadmissible."

As noted above, appellant objects to the admission of Dr. Wells' opinions regarding the severity and adequacy of the axle torque tests, and as to the reasonableness of continuing production of the DH-7, unmodified, after the results of those tests were known. When we review the record, we find there was extensive foundation laid for Dr. Wells' testimony. Without going into great detail, Dr. Wells has a substantial educational and occupational background as a consulting engineer in the field of metallurgy. He has advised numerous companies regarding testing techniques, manufacturing processes and the like. He has also been asked to advise concerning appropriate actions to be taken by manufacturers in response to unusually high failure rates in their products.

We conclude the opinions relating to the test were proper, and that it was not an abuse of discretion by the trial court to allow admission of the opinions relative to continued production. Even if the last-mentioned opinions were not truly necessary (as any

layman could have independently arrived at such conclusion), and might therefore have been objectionable, we hold the admission of such opinions to be, at most, harmless error, not requiring reversal. See K.S.A. 60-261; *Lemons v. St. John's Hospital of Salina,* 5 Kan. App. 2d 161, Syl. ¶ 8, 613 P.2d 957 (1980).

It appears that appellee's principal theory of the case was that appellant's continued manufacture and sale of the DH-7 after it knew of the inadequacy of the R-9000 axle without informing its dealers or customers of same, constituted both fraudulent concealment, and gross and wanton conduct. This theory was accepted by the jury, as reflected in its verdict. Arguably, if appellant had continued to sell the DH-7, but had informed its customers of its shortcomings, the verdict on those two issues might well have been otherwise. But the evidence was uncontroverted that appellant did in fact know that the axles on the DH-7 would fail at torque levels substantially less·than those to be expected in normal operation, and that appellant knew this before appellee's purchase, but did not inform appellee or even its own dealer of this fact. Thus, it appears to this court that the above-mentioned opinions expressed by Dr. Wells added very little, if anything, to appellee's case.

Appellant next contends that the trial court erred in submitting the issue of punitive damages to the jury.

Appellant bases this contention on its averment that the opinions of Dr. Wells were improper and that they inflamed the passions of the jury. We disagree.

First, as explained above, we do not feel that the portion of the opinion testimony by Dr. Wells which was objected to is an error meriting reversal. It did not relate directly to appellee's primary allegations, that appellant was guilty of fraudulent concealment, and gross and wanton conduct. These allegations were proven by evidence totally independent from the testimony of Dr. Wells. These allegations, if proven, would support an award of punitive damages. Therefore, we hold that the question of punitive damages was properly before the jury.

Appellant's final argument is that the amount of punitive damages awarded was excessive.

Appellee prayed for actual damages in the amount of $79,844.20. The jury awarded actual damages in the amount of $55,500. The damages awarded represented the purchase price of

the DH-7 (approximately $38,000), interest on the purchase money loan, costs of renting a replacement machine, and the loss of profits and increases in expenses due to downtime (approximately $17,500). The jury specifically predicated the award of actual damages on appellee's return of the DH-7 to appellant. The jury also awarded punitive damages in the amount of $350,000. This figure is slightly greater than a multiple of six times the amount of actual damages. This fact alone, claims appellant, renders it clearly excessive.

The rules concerning the theory underlying and grounds justifying an award of punitive damages, as well as those governing appellate review of such awards, have been the subject of recent pronouncements of the Supreme Court.

"Our court has stated that punitive damages 'are permitted whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy. (*Malone v. Murphy,* 2 Kan. 250; *Albert Wiley v. Keokuk,* 6 Kan. 94; and *Cady v. Case,* 45 Kan. 733, 26 Pac. 448.) Such damages are allowed not because of any special merit in the injured party's case, but are imposed by way of punishing the wrongdoer for malicious, vindictive or a willful and wanton invasion of the injured party's rights, the purpose being to restrain and deter others from the commission of like wrongs. (*Stalker v. Drake,* 91 Kan. 142, 136 Pac. 912; see, also, *Townsend v. Seefeld,* 102 Kan. 302, 169 Pac. 1157; and 15 Am. Jur., Damages, § 266, p. 700.)' *Watkins v. Layton,* 182 Kan. 702, 705, 324 P.2d 130 (1958). In determining the amount of punitive damages, the trier of fact may consider 'the nature, extent and enormity of the wrong, the intent of the party committing it and generally all the circumstances attending the particular transaction, together with any mitigating circumstances tending to reduce the verdict or wholly defeating the damages.' *Sweaney v. United Loan & Finance Co.,* 205 Kan. 66, Syl. 7, 468 P.2d 124 (1970). The trier may also take into account the 'probable expenses of litigation, including attorney's fees . . . where such expenses are not stated to be matters which must be made a basis of compensation.' *Brewer v. Home-Stake Production Co.,* 200 Kan. 96, Syl. 2, 434 P.2d 828 (1967)." *Sanders v. Park Towne, Ltd.,* 2 Kan. App. 2d 313, 318-319, 578 P.2d 1131, *rev. denied* 225 Kan. 845 (1978).

In *Henderson v. Hassur,* 225 Kan. 678, 694, 594 P.2d 650 (1979), the court stated:

"It is difficult, if not impossible, to lay down precise rules by which to test the question of when a verdict for punitive damages is excessive. *Motor Equipment Co. v. McLaughlin,* 156 Kan. 258, 273, 133 P.2d 149 (1943). Punitive damages are imposed by way of punishing a party for malicious or vindictive acts or for a willful and wanton invasion of another party's rights, the purpose being to restrain him and to deter others from the commission of like wrongs. *Koch v. Merchants Mutual Bonding Co.,* 211 Kan. 397, 402, 507 P.2d 189 (1973). The law establishes no fixed ratio between actual and exemplary damages by which to

determine excessiveness. In assessing punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. Any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages. *Will v. Hughes,* 172 Kan. 45, 55, 238 P.2d 478 (1951). In fixing an award of punitive damages a jury may consider the amount of actual damages recovered, defendant's financial condition and the probable litigation expenses. *Ayers v. Christiansen,* 222 Kan. 225, 229, 564 P.2d 458 (1977)."

Also, in *Cantrell v. R. D. Werner Co.,* 226 Kan. 681, 686, 602 P.2d 1326 (1979), it was stated:

"Where a charge of excessive verdict is based on passion or prejudice of the jury, but is supported solely by the size of the verdict the trial court will not be reversed for not ordering a new trial, and no remittitur will be ordered unless the amount of the verdict in light of the evidence shocks the conscience of the appellate court. See *Kirk v. Beachner Construction Co., Inc.,* 214 Kan. 733, Syl. ¶ 1, 522 P.2d 176 (1974); *George v. Bolen-Williams, Realtors,* 2 Kan. App. 2d 385, 580 P.2d 1357 (1978)."

Here there is no contention made that the jury was not properly instructed, and in looking over the jury instructions, we conclude that it was properly instructed. It was specifically instructed relative to the findings necessary to support an award of punitive damages. Thus, we conclude that the punitive damages question was properly presented to the jury and was for that body to determine. It has done so.

In various Kansas cases, and particularly in *Brewer v. Home-Stake Production Co.,* 200 Kan. 96, 434 P.2d 828 (1967), the Kansas courts have enumerated certain factors to be considered as to the *amount* of punitive damages. We have applied those factors in arriving at our decision in this case.

This case differs, rather markedly, from a number of other cases both from Kansas and other jurisdictions, where a large amount has been awarded as punitive damages. Many cases which we have studied, including *Cantrell v. R. D. Werner Co.,* 226 Kan. 681; *Ayers v. Christiansen,* 222 Kan. 225, 564 P.2d 458 (1977); *Kirk v. Beachner Construction Co., Inc.,* 214 Kan. 733, 522 P.2d 176 (1974); *Sweaney v. United Loan & Finance Co.,* 205 Kan. 66, 468 P.2d 124 (1970); *Townsend v. Seefeld,* 102 Kan. 302, 169 Pac. 1157 (1918); *Stalker v. Drake,* 91 Kan. 142, 136 Pac. 912 (1913); and *Albert Wiley v. Keokuk,* 6 Kan. 94 (1870); have involved situations where the wrongdoing of defendant was dangerous to the physical security and well-being, and in some cases, even to the life of the plaintiff, or where the wrongful or malicious nature

of the defendant's activity was much more pronounced than in the instant case.

In the instant case, we take special note that there was a very minimum of evidence to indicate a danger of physical injury to persons as a result of appellant's conduct.

Moreover, there was testimony to the effect that no personal injuries were in fact caused by the equipment which is the res of this case. Neither does it appear that there was herein an evil or malicious attitude displayed by the appellant manufacturer. In fact, it appears appellant attempted, as best it could, to correct the problems which beset appellee's machine. Even in the face of a jury verdict which found appellant guilty of gross and wanton conduct, and of reckless disregard of the rights of others, we conclude such conduct was much less in extent than that exhibited in most punitive damages cases.

Because of the jury's findings, punitive damages herein are warranted. But, for the reasons set out above, the amount of such award shocks the conscience of this court. Regardless of our belief that the punitive damages award is excessive, we acknowledge the fact that the record discloses that on December 31, 1980, appellant had total assets of $1,227,377,000, and that the stockholders' equity in appellant company was $553,181,000. Thus, while we feel the jury's award of $350,000 is excessive to the point that it shocks the conscience of this court, we nevertheless conclude that substantial punitive damages should be awarded.

It is our conclusion that the punitive damages award of $350,000 should be reduced to $150,000, upon the condition that the appellee accept the reduced amount of punitive damages in writing within twenty days after this decision becomes final, by filing an acceptance with the clerk of the district court; upon failure to accept the remittitur within the time allotted, a new trial shall be granted on the issue of punitive damages.

We affirm the jury's finding of liability, and its award of actual damages, in their entirety.

Affirmed in part, reversed in part and remanded with instructions.

REES, J.: Concurring.

I concur in the result announced by the majority. However, I feel compelled to express certain observations.

The principles governing the award, amount and appellate

review of punitive damages enunciated in the majority opinion were approved and reiterated by our Supreme Court less than three months ago in *Binyon v. Nesseth,* 231 Kan. 381, 386-387, 646 P.2d 1043 (1982). They are not challenged by Case. Further, and quite importantly, Case makes no claim of error in the jury instructions.

Case lodges two arguments attacking the punitive damages judgment. First, it argues that in the absence of the purportedly inadmissible testimony by Wells, the evidence was insufficient to support any punitive damages verdict. I agree with the majority that even if the challenged testimony of Wells was erroneously admitted, the other evidence was ample to support a punitive damages verdict and that verdict is not established on appeal to be fatally tainted.

Second, Case argues the amount of the punitive damages verdict is excessive. I join the majority in concluding $350,000 shocks our collective conscience. As we should, because a jury decided $350,000 was proper under the circumstances shown by the evidence presented, we have given the question careful and concerned deliberation. For the benefit of those immediately involved, as well as readers of this published opinion, additional discussion of factors considered seems justified.

Relying upon the purpose of punitive damages to be punishment of the defendant and deterrence of like conduct by others, plaintiff argues that because Case's financial statements admitted as evidence show its net worth at the end of 1979 and 1980 to have been on the order of half-a-billion dollars, $350,000 is not excessive. The gist of this argument is that an award of that magnitude is necessary to call Case's attention to the error of its ways. However that may be, the same financial statements also reveal Case's average income from operations for the years 1978, 1979 and 1980 was on the order of 8.25% of its net sales. In other words, for each dollar of income from operations a bit more than $12 in net sales was required. Thus, a $350,000 punitive damages judgment may be said to represent a loss to Case of all income from operations attributable to $4,240,000 in sales. A $150,000 punitive damages judgment represents a like loss of income from $1,820,000 in sales produced at a cost of $1,670,000. I am satisfied a punitive damages award of the latter magnitude serves the aforementioned purpose.

From the time Case began production of the DH-7 trenchers until February 3, 1981, 215 units were manufactured and shipped; 98 of these were sold at retail to customers and users such as plaintiff. Of the 215 units, 35 were manufactured by January, 1980, and 180 thereafter. I find the evidence reveals the R-9000 axle shaft was not incorporated as a component part of the DH-7 trenchers manufactured after January, 1980. In contrast to *U.S.D. No. 490 v. Celotex Corp.,* 6 Kan. App. 2d 346, 358, 629 P.2d 196, *rev. denied* 230 Kan. 819 (1981), the evidence does not show a nationwide course of conduct bounded only by the number of sales of defective DH-7 units that could be generated.

Also in contrast to *Celotex,* this case does not involve affirmative misrepresentation. In *Celotex,* there was evidence the defendant made a knowing, continual and nationwide affirmative false representation to the architectural profession and construction industry that the performance of its two-ply roofing system would equal or exceed the performance of four-ply roofing installations. 6 Kan. App. 2d at 349, 356, 358. The case before us is one of misrepresentation by silence.

A DH-7 trencher, a self-propelled machine, has two differential assemblies. Within each differential assembly are two axle shafts. Case had differential assemblies, or kits, in stock. When there was a failure of or within a differential assembly, repair and replacement could be and was accomplished by removal of an entire assembly from the machine and replacement of it with a new kit. The assembled kits were purchased by Case and it in turn either incorporated them in the trenchers as a part of its manufacturing process or furnished them to customers and users as replacements where failures were experienced. The differential assemblies stocked by Case appear to have been of two types; one was a "no spin" differential and the other was a "limited slip" differential. The difference lay in the operational performance characteristics of the differential, not in the torque limits of the axle shafts. Finding nothing to the contrary in the record, I assume R-9000 axle shafts were utilized in both the "no spin" and "limited slip" kits. The reference in the majority opinion to the fact plaintiff and a Price Brothers representative felt they had been lied to has to do with the fact that after a particular attempt by representatives of Case to remedy plaintiff's problem with his trencher, the machine was left with one "no spin" differential and one "limited slip"

differential installed rather than two "no spin" or two "limited slip" differentials. There was no "lie" as to the torque load capacity of the R-9000 axle shaft, the product characteristic that is at the heart of this lawsuit.

Plaintiff suffered no personal injury. The defect causing plaintiff's trencher to be not merchantable did not render the machine dangerous to the physical safety of persons; the machine was simply inoperative when there was an axle failure. There was no risk of serious personal injury.

By their actual damages award, the jury granted plaintiff recovery of his purchase price (approximately $38,000) and compensated him for his incidental and consequential damages (approximately $17,500), all of which were economic in nature. There was no consequential property damage suffered and the evidence reveals no risk of property damage.

Whatever the emotional justification, by January, 1980, plaintiff adopted an intransigent position as to Case and its dealer, Price Brothers, although they continued their efforts to remedy his problem.

The majority comments the jury instructions given were proper. I do not wholly agree. Because the instructions are not challenged, the question is immaterial. Nonetheless, I am concerned with the majority's seeming approval of a right to recover punitive damages for "gross and wanton conduct" standing alone. I disagree with that proposition. This plaintiff's right to recover punitive damages lies in the specific finding of the jury that Case was guilty of fraudulent concealment.

In contrast to *Kiser v. Gilmore,* 2 Kan. App. 2d 683, 692, 697, 587 P.2d 911 (1978), *rev. denied* 225 Kan. 844 (1979), and *U.S.D. No. 490 v. Celotex Corp.,* 6 Kan. App. 2d at 364, special questions were submitted to the jury. They specifically answered they found Case breached its implied warranty of merchantability and was guilty of fraudulent concealment. This requires affirmance of actual and punitive damages awards.

"Gross and wanton neglect of duty" was not a claim submitted to the jury and it was not a jury finding. The jury's answer that Case's conduct amounted to gross and wanton conduct is surplusage in light of the fraudulent concealment finding.