No. 54,482

SHERMAN H. SAMPSON, *Appellee*, v. JACK R. HUNT and CONSTRUCTION AND DEVELOPMENT, INC., *Appellants*.

(665 P.2d 743)

Opinion filed June 10, 1983.

*Terry C. Pilgreen,* of Woodard, Blaylock, Hernandez, Pilgreen & Roth, of Wichita, argued the cause and was on the briefs for the appellants.

*John Terry Moore,* of Moore, Rapp & Schodorf, of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is a malicious prosecution action in which Jack R. Hunt and Construction and Development, Inc. (defendants-appellants), appeal a jury award for actual and punitive damages entered against them and in favor of Sherman H. Sampson (plaintiff-appellee). The appellants contend the trial court erred in (1) directing verdicts in favor of the plaintiff on the issues of whether the appellants had probable cause to file the previous lawsuits, and whether Jack R. Hunt was the alter ego of Construction and Development, Inc.; (2) ruling there was sufficient evidence to support the award of actual damages; and (3) ruling the amount of punitive damages was not excessive.

This lawsuit is the culmination of a long history of business association and litigation between the plaintiff and defendants. In 1960 or 1961 the plaintiff and defendant Hunt became business partners and formed Construction and Development, Inc. (C & D). They were also partners in several other business projects, including Bonanza, Inc., which owned the Sweetbriar Shopping Center in Wichita. In 1970 Hunt and Sampson agreed to separate their joint business interests. Hunt became the sole owner of C & D. Hunt also purchased Sampson's interest in Bonanza, Inc., and the Sweetbriar Shopping Center.

Prior to this time C & D had entered into a contract with Seneca Square, Inc., to construct an addition to the Seneca Square Shopping Center in Wichita, which was owned by Seneca Square, Inc. Seneca Square, Inc., was wholly owned by Western Land and Development, Inc. (Western). Due to problems encountered during construction, it became necessary for Seneca Square, Inc., to arrange additional financing so the project could be completed. The Fourth National Bank and Trust Company in Wichita was unwilling to advance additional financing unless the indebtedness could be personally guaranteed by financially responsible people. Frank Malone, a stockholder in Western and Seneca Square, Inc., asked Hunt to approach Sampson about the possibility of these three individuals personally guaranteeing the note for Seneca Square, Inc. Sampson agreed, and in exchange for their participation, Hunt and Sampson each received one-third of Malone's stock in Western. In addition, Malone, Sampson and Hunt entered into an indemnity agreement wherein they each assumed equal liability (one-third) of any indebtedness owed by Seneca Square, Inc. For its work on the project C & D received a promissory note from Seneca Square, Inc., in the amount of $50,000. This note was personally guaranteed by Sampson, Malone and Hunt to enable C & D to pledge it as collateral for other loans.

In 1971, Sampson, Malone and Seneca Square, Inc., in three separate lawsuits, sued Hunt and C & D for fraud, misrepresentation and breach of fiduciary duty arising out of the financing of the Seneca Square project. C & D filed a counterclaim against the plaintiff for collection of the $50,000 promissory note. These actions were consolidated for trial and eventually resulted in a stalemate, with judgment denied on all claims of the parties. In

denying judgment to C & D on the promissory note the trial court ruled:

"The note given to Construction and Development, Inc., by Seneca Square, Inc., for $50,000 is a valid, legal obligation of the plaintiff, Seneca Square, Inc.; endorsements and guarantees of the plaintiffs, Sampson and Malone, were made with consideration; and further, the note in question is covered by the terms of the so-called 'Indemnity Agreement' of July, 1970."

In addition the trial court made the following specific finding of fact:

"The plaintiffs, Sampson and Malone, and the defendant, Hunt, jointly and severally, endorsed and guaranteed payment to the Fourth National Bank and Trust Company, Wichita, Kansas on behalf of Seneca Square, Inc. but the maximum amount that such endorsements and guarantees reached was $2,200,000.00. That at the present time there is still due and payable to the Fourth National Bank a sum of around $15,000.00. That all three of the above-named parties have paid their proportionate share of the amounts of such debts. *The defendant, Hunt, is responsible for the $15,000.00.*" (Emphasis added.)

During the course of discovery in the Seneca Square case, Sampson learned that Hunt had withheld information and made misrepresentations concerning the financial situation of Bonanza, Inc., when Hunt purchased Sampson's interest in that enterprise. Sampson and other family members who had owned shares of Bonanza, Inc., commenced a second lawsuit against Hunt while the Seneca Square case was pending, alleging fraud and breach of fiduciary duty. Sampson and his family were awarded a judgment against Hunt in the amount of $93,000. This case was appealed by Hunt to the Supreme Court and affirmed in *Sampson v. Hunt,* 222 Kan. 268, 564 P.2d 489 (1977). Sampson ultimately collected approximately $120,000 from Hunt on the judgment and accumulated interest.

In November 1973, while the Bonanza, Inc., lawsuit was pending, the Fourth National Bank and Trust Company of Wichita filed a lawsuit against Malone, Sampson and Hunt to collect the balance of $15,000 due on a promissory note guaranteed by them in connection with the Seneca Square project. This was the same $15,000 found by the court in the Seneca Square case to be owed by Hunt. Hunt filed a cross-claim against Sampson and Malone, *as sole owner of C & D, to collect under the indemnity agreement on the $50,000 promissory note* given by Seneca Square, Inc., to C & D. Hunt alleged in his cross-petition that the promissory note was pledged as security for a bank

loan with People's State Bank of McPherson which was used in furtherance of the Seneca Square project. Hunt subsequently was required to make payments of over $30,000 in principal and interest on the note. Hunt sought indemnification from Malone and Sampson as personal guarantors on the note, pursuant to the indemnification agreement. C & D was not a party in the Fourth National Bank case. Eventually Hunt paid the balance due on the Fourth National Bank note and *all claims in the case were dismissed with prejudice on March 29, 1974, including Hunt's cross-claim on the $50,000 promissory note.*

The present action is the result of two lawsuits filed on December 31, 1975. In the first lawsuit, entitled *Construction and Development, Inc. v. Seneca Square, Inc., Frank A. Malone and Sherman H. Sampson,* case No. C35451 (Note Case), C & D sought to *collect on the $50,000 promissory note from the named defendant.* Malone and Sampson were subsequently dismissed from the case on the ground that the claim on the promissory note had previously been filed against them and dismissed with prejudice in the Fourth National Bank case, constituting res judicata. The order of dismissal was appealed by defendant Hunt, but was subsequently dismissed.

The second lawsuit, *Jack R. Hunt v. Seneca Square, Inc., Western Land & Development, Inc., Frank A. Malone and Sherman H. Sampson,* case No. C35452 (Bank Case), arose out of a dispute over a lease agreement entered into between Seneca Square, Inc., and one of the tenants of the Seneca Square Shopping Center on January 4, 1974. At that time Hunt, Sampson and Malone were stockholders and directors of Western and Seneca Square, Inc. The new lease agreement provided for an advance rental payment of approximately $111,000. This money was used to pay off outstanding notes owed by Seneca Square, Inc., totaling over $100,000. These notes were personally guaranteed by Sampson, Hunt and Malone. Hunt opposed ratification of the new lease agreement because he felt it would be in violation of the mortgage agreement with the first mortgage holder on the shopping center and would trigger a foreclosure on the property, the sole asset of Seneca Square, Inc.

Due to financial difficulties encountered by Seneca Square, Inc., *a majority of the directors voted in July 1974, not to make the mortgage payment on the property and instead to pay all*

*other outstanding indebtedness owed by Seneca Square, Inc., including obligations personally guaranteed by stockholders of the company.* Subsequently, in August 1974, the mortgage holder instituted foreclosure proceedings against the property. The shopping center property was ultimately assigned to the mortgagee in lieu of foreclosure.

The defendant Hunt brought the lawsuit against Malone and Sampson, as majority stockholders of Western, alleging fraud and breach of fiduciary duty in executing the new lease agreement, resulting in foreclosure and the loss of his investment in the property in the amount of $111,000. Hunt subsequently repurchased the property for the mortgagee, and in October 1977, almost two years after the suit was filed, he dismissed the action against Malone and Sampson. Hunt testified he dismissed the action because he felt it was time to "extend the olive branch" and bring the disputes between him and Sampson to an end.

The case at bar was instituted by the plaintiff in July 1978, against defendants Hunt and C & D, alleging that defendant Hunt was the alter ego of C & D and that both the Note Case and Bank Case were brought maliciously and without probable cause. The plaintiff sought actual damages in the amount of $10,000 and punitive damages of $1,000,000 for each alleged maliciously prosecuted case. After hearing evidence by both sides the trial court granted directed verdicts in favor of the plaintiff on four issues, ruling as a matter of law: (1) defendant Hunt was the alter ego of defendant Construction and Development, Inc.; (2) defendants Hunt and C & D did not have probable cause to bring the lawsuit in the Note Case; (3) defendant Hunt did not have probable cause to bring the lawsuit in the Bank Case; and (4) both cases terminated in favor of the plaintiff. The jury was instructed accordingly and returned a verdict in favor of the plaintiff in the amount of $10,000 actual and $300,000 punitive damages for each maliciously prosecuted case. The trial court denied the defendants' motion for new trial and remittitur of damages. This appeal has been duly perfected.

The appellants first contend the trial court erred in sustaining the appellee's motions for directed verdict on the issues of probable cause and whether defendant Hunt was the alter ego of C & D. The appellants do not challenge the ruling of the trial

court that the two previous lawsuits terminated in favor of the plaintiff.

In ruling on a motion for directed verdict pursuant to K.S.A. 60-250 the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. The same basic rule governs appellate review of a motion for directed verdict. *Frevele v. McAloon,* 222 Kan. 295, Syl. ¶ 5, 564 P.2d 508 (1977); *Lemley v. Penner,* 230 Kan. 25, 27, 630 P.2d 1086 (1981). The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury could properly find a verdict for that party. Even where facts are undisputed it is possible that conflicting inferences may be drawn from those facts, and where that is true, the issue must be submitted to the jury. *Sexsmith v. Union Pacific Railroad Co.,* 209 Kan. 99, Syl. ¶ 3, 495 P.2d 930 (1972). Where no evidence is presented on a particular issue, or the evidence presented is undisputed and it is such that the minds of reasonable persons may not draw differing inferences and arrive at opposing conclusions with reason and justice, the matter becomes a question of law for the court's determination. *Thurman v. Cundiff,* 2 Kan. App. 2d 406, 411, 580 P.2d 893 (1978); *Southards v. Central Plains Ins. Co.,* 201 Kan. 499, 505, 441 P.2d 808 (1968); *Kemp v. Railway Co.,* 91 Kan. 477, 483, 138 Pac. 621 (1914).

We will first consider the appellants' claim the trial court erred in directing a verdict in favor of the plaintiff on the alter ego issue. This issue was listed in the pretrial order as a question of law to be determined by the trial court. When a pretrial order is entered by the trial court pursuant to K.S.A. 60-216, it has the full force and effect of other orders of the court and controls the subsequent course of trial unless modified to prevent manifest injustice. *Black v. Don Schmid Motor, Inc.,* 232 Kan. 458, 468, 657 P.2d 517 (1983), and cases cited therein. In *Kleibrink v. Missouri-Kansas-Texas Railroad Co.,* 224 Kan. 437, 442, 581 P.2d 372 (1978), we held the trial court's refusal to give an instruction on right-of-way was correct where the right-of-way was not specifically made an issue in the pretrial order. K.S.A. 60-216 provides in part:

"In any action, the court shall on the request of either party, or may in its discretion without such request, direct the attorneys for the parties to appear before it for a conference to consider:

. . . .

"(2) The trial of issues of law the determination of which may eliminate or affect the trial of issues of fact."

The appellants here made no attempt to modify the pretrial order. It follows that the order controls the subsequent course of the litigation. The trial court's refusal to submit the alter ego issue to the jury for consideration and its determination of the issue on the motion for a directed verdict was not error. The court's ruling that Hunt was acting as the alter ego of C & D is supported by the evidence.

The doctrine of alter ego is used to impose liability on the individual who uses a corporation merely as an instrumentality to conduct his own personal business. Such liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. Under it the court merely disregards the corporate entity and holds the individual responsible for his acts knowingly and intentionally done in the name of the corporation. *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 797, 473 P.2d 33 (1970). In *Amoco Chemicals Corporation v. Bach*, 222 Kan. 589, 594, 567 P.2d 1337 (1977), the following factors were considered significant in justifying a disregard of the corporate entity:

"(1) Undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud."

Mere single ownership of a corporation is not sufficient in itself to treat the corporation as an alter ego of the owner and justify a disregard of the corporate veil. 222 Kan. at 594; *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, Syl. ¶ 6. Each case involving disregard of the corporate entity must rest upon its special facts. 18 Am. Jur. 2d, Corporations § 15. Finally, power to pierce the corporate veil is to be exercised reluctantly and cautiously. *Amoco Chemicals Corporation v. Bach*, 222 Kan. at 593.

In recent years this court has upheld the alter ego finding of

the trial court in two cases. In *Kirk v. H.G.P. Corporation, Inc.*, 208 Kan. 777, 780, 494 P.2d 1087 (1972), the defendant corporation was found to be a tool by which the defendant conducted his own business where he was the principal stockholder, officer and manager of the corporation; principal creditor; principal receiver of assets of the corporation; principal worker and principal transferee of all funds secured by the corporation. In *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. at 797-98, the court pierced the corporate veil of three successive corporations and held the defendant liable for the debts of the corporations where the corporations were undercapitalized, the defendant provided what little capital there was, each corporation occupied the same building and manufactured the same general product, when each corporation ceased functioning its assets were transferred to the successor corporation, and when the third corporation ceased activities its assets were sold and the proceeds used to pay on a bank loan personally guaranteed by the defendant. In addition, the defendant was an officer in all the corporations, set the policies and made all final decisions. No board of directors' meetings were held and corporate reporting was largely disregarded.

In the present case the facts surrounding Hunt's management, ownership and control of C & D are largely undisputed. Hunt testified at trial he is the sole stockholder, president and director of C & D. He stated that he "controls" the company. C & D has done no business since the Seneca Square project was completed. The corporation has filed annual reports and tax returns each year. The defendant testified he has kept the corporation in good standing with the State of Kansas because it has a general contractor's license which he may want or need to use at some future time to again become active in the construction business. Money needed by the corporation to file its annual report has been contributed by Hunt. Hunt testified the value of the company is zero and its only assets consist of the contractor's license, a checkbook and a minutes book. He also testified he personally had to pay off bank loans borrowed by C & D during its involvement in the Seneca Square project.

A significant factor for consideration is the cross-claim filed in the Fourth National Bank case by Hunt, as sole owner of C & D, to collect from Malone and Sampson two-thirds of the $50,000

note given by Seneca Square, Inc., to C & D. Hunt's cross-petition in that case alleged the note was pledged by C & D as collateral for a loan with People's State Bank of McPherson. The proceeds of the loan were used in furtherance of the Seneca Square project to the benefit of Seneca Square, Inc. Hunt, as one of the personal guarantors of the note, was subsequently required to pay over $30,000 in principal and interest on the loan. Hunt alleged that under the indemnity agreement Sampson and Malone each owed him *one-third of the $50,000 principal of the note owed to C & D.*

The appellee contends Hunt was acting for C & D and was merely asserting C & D's right to collection of the note. The appellants, on the other hand, contend Hunt was merely attempting to enforce his personal right to indemnification from Malone and Sampson for the amount he was required to pay as guarantor of the note. The appellants' position is largely discredited in view of the fact the cross-petition asserted a claim for two-thirds of the entire amount of the principal owed to C & D on the note, rather than for two-thirds of the amount paid by Hunt as guarantor, which is all that would have been owed by Malone and Sampson to Hunt personally under the indemnity agreement. For all practical purposes, Hunt's claim was asserted on behalf of C & D for payment of the $50,000 promissory note owed C & D by Seneca Square, Inc.

At the time the Note Case was filed the defendant corporation was essentially defunct. It had not done any business for several years. It had no assets of any monetary value. It was kept alive by the defendant Hunt solely to retain its general contractor's license in case Hunt should ever desire to return to the construction business. There were not other owners, directors or officers of the corporation. Hunt himself testified he controlled the operation of the corporation. The corporation was not merely undercapitalized; it had no capitalization. Hunt contributed all money to the corporation which was necessary to keep it in good standing. The appellants contend Hunt did not utilize C & D as his own personal business conduit and did not treat income of C & D as his own. This is not surprising in light of the fact C & D did no business and had no income in the years in question. As discussed above, however, Hunt acted on behalf of C & D in the Fourth National Bank case, in seeking to enforce C & D's right to

payment on the $50,000 promissory note. The trial court properly concluded no reasonable juror could disagree that Hunt was the alter ego of Construction and Development, Inc.

The appellants next contend the trial court erred in ruling as a matter of law there was no probable cause for the appellants to bring the two previous actions. In *Nelson v. Miller*, 227 Kan. 271, 276, 607 P.2d 438 (1980), we set forth the following elements a plaintiff must prove to maintain an action for malicious prosecution:

"(a) That the defendant initiated, continued, or procured civil procedures against the plaintiff.

"(b) That the defendant in so doing acted without probable cause.

"(c) That the defendant acted with malice, that is he acted primarily for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based.

"(d) That the proceeding terminated in favor of plaintiff.

"(e) That the plaintiff sustained damages."

Concerning the element of probable cause we said:

"Probable cause for instituting a proceeding exists when there is a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent man in the belief that the party committed the act of which he is complaining. [Citations omitted.] In cases of malicious prosecution, the inquiry as to want of probable cause is limited to the facts and circumstances as they appeared to defendant at the time the prosecution was commenced. [Citations omitted.] If the facts are undisputed, the question of probable cause is one for the court to decide as a matter of law. [Citations omitted.] If the facts tending to establish the existence or want of existence of probable cause are in dispute, it becomes the duty of the trial court to submit the question to the jury." 227 Kan. at 277-78.

See also 52 Am. Jur. 2d, Malicious Prosecution § 51; Prosser, Law of Torts § 119, pp. 841-47 (4th ed. 1971); Restatement (Second) of Torts § 675 (1977).

Did the trial court err in ruling as a matter of law the defendant Hunt and C & D did not have probable cause to bring the case to collect on the promissory note? The trial court in that case ruled the dismissal of Hunt's cross-claim in the Fourth National Bank case was res judicata and barred C & D's right to maintain an action on the same claim. That determination was not appealed and is not an issue before this court. The appellee contends the finding of res judicata is tantamount to lack of probable cause as a matter of law and therefore the trial court did not err. The appellants, on the other hand, argue that at the time the action

was filed it did not appear res judicata would apply because C & D was not a party to the Fourth National Bank case and Hunt was asserting a claim in his own right under the indemnity agreement. They contend the Note Case was the first attempt by C & D to collect on the note since acquiring title after the Seneca Square case where it was adjudged to be a valid, binding obligation of the guarantors and covered by the idemnity agreement.

A termination of civil proceedings by a competent tribunal adverse to the person initiating them is not conclusive evidence they were brought without probable case. Restatement (Second) of Torts § 675, comment *b*; Prosser, Law of Torts § 120, p. 855; *Stohr v. Donahue,* 215 Kan. 528, 529, 527 P.2d 983 (1974); 52 Am. Jur. 2d, Malicious Prosecution § 163. As stated in the comments following the Restatement (Second) of Torts § 675:

"*e. Mistake of Law.* . . . In determining probable cause for initiation of civil proceedings, all that is necessary is that the claimant reasonably believe that there is a sound chance that his claim may be held legally valid upon adjudication.

"*f.* If the legal validity of a claim is uncertain, the person who initiates the civil proceeding may believe that his claim is meritorious, but he can have no more than an opinion that the chances are good that the court might decide to uphold it. The question is not whether he is correct in believing that the court would sustain the claim, but whether his opinion that there was a sound chance that the claim might be sustained was a reasonable one."

See also 52 Am. Jur. 2d, Malicious Prosecution § 55.

For res judicata to apply the claim or cause asserted in the actions must be identical and the parties involved must be the same or in privity with one another. *Wells v. Davis,* 226 Kan. 586, 589-90, 603 P.2d 180 (1979). Hunt, as sole owner of C & D, was in complete privity with C & D when he asserted its right to payment of the $50,000 note from Malone and Sampson in the Fourth National Bank case. This same claim was asserted by C & D in the Note Case. Under the circumstances presented here the appellants had no reasonable ground to believe a legitimate cause of action existed on behalf of C & D for payment of the $50,000 note at the time the Note Case was filed. The dismissal of the claim with prejudice in the Fourth National Bank case was res judicata and barred a subsequent action by C & D against Malone and Sampson for payment on the note. The trial court properly ruled as a matter of law the appellants did not have probable cause to bring the action in the Note Case.

The next point is whether the trial court erred in ruling as a matter of law defendant Hunt did not have probable cause to bring the action against Sampson for fraud and breach of fiduciary duty in the Bank case. The basis of this action was the lease agreement entered into between Seneca Square, Inc., and one of the tenants of the shopping center over Hunt's objection and because funds were diverted from the mortgagee to pay off personal obligations of the stockholders of Seneca Square, Inc., including those of Hunt. These actions resulted in foreclosure on the property.

In *Newton v. Hornblower, Inc.*, 224 Kan. 506, Syl. ¶¶ 8, 9, 582 P.2d 1136 (1978), we stated:

"Officers and directors of a corporation occupy a strict fiduciary relationship with respect to both the corporation and its shareholders. The same fiduciary standard applies as between directors.

"Any unfair transaction undertaken by one in a fiduciary relationship may result in liability for unjust enrichment of the fiduciary. Where the fairness of a fiduciary transaction is challenged, the burden of proof is upon the fiduciary to prove by clear and satisfactory evidence that such transaction was fair and done in good faith."

See also *Sampson v. Hunt*, 222 Kan. at 271; *Parsons Mobile Products, Inc. v. Remmert*, 216 Kan. 256, 259-60, 531 P.2d 428 (1975); 19 Am. Jur. 2d, Corporations § 1272. A strict fiduciary duty is imposed on officers and directors of a corporation to act in the best interest of the corporation and the stockholders. The duty imposed by this position of trust requires an officer or director to work for the general interests of the corporation. *Newton v. Hornblower, Inc.*, 224 Kan. at 514; *Parsons Mobile Products, Inc. v. Remmert*, 216 Kan. 256, Syl. ¶ 2, 531 P.2d 428 (1975); 18 Am. Jur. 2d, Corporations § 497. The standard of duty by which the conduct of a director of a corporation is to be judged should be that measure of attention, care, and ability which the ordinary director and officer of corporations of a similar kind would be reasonably and properly expected to bestow upon the affairs of the corporation. *Speer v. Dighton Grain, Inc.*, 229 Kan. 272, 276, 624 P.2d 952 (1981). Directors and officers are liable to the corporation and the stockholders for losses resulting from their malfeasance, misfeasance or their failure or neglect to discharge the duties imposed by their offices. 229 Kan. 272, Syl. ¶ 8. The directors have the power to control and direct the affairs of the corporation, and in the absence of fraud, courts will

generally not interfere on behalf of a dissatisfied stockholder with the discretion of the directors on questions of corporate management, policy or business. 19 Am. Jur. 2d, Corporations § 533.

Applying these rules to the facts of this case no evidence appeared in the record from which it could reasonably be concluded that Hunt had probable cause to bring an action against Sampson and others for breach of fiduciary duty owed Western's minority stockholders. Hunt testified he participated in the negotiations with the tenant for the new lease. He was aware at all times that negotiations were underway for a new lease; however, he testified he did not participate in the ultimate lease agreement and did not ratify the new lease. He was not aware a new lease had been signed by the stockholders until some time after it was signed. At a meeting of the stockholders in April 1974, a majority of the directors ratified the lease over Hunt's objections. The money from the advance rental payment under the new lease was used to eliminate two notes owed by Seneca Square, Inc., upon which Hunt, Sampson and Malone were guarantors. In July 1974, a meeting of the board of directors was called, and a majority of the board voted to pay off obligations of Seneca Square, Inc., which were personally guaranteed by stockholders, including Hunt and Sampson, rather than pay the mortgagee. This was again done over Hunt's objection. At this time Seneca Square, Inc., was in serious financial straits and foreclosure was imminent. Hunt and Sampson benefited equally from the elimination of the obligations of Seneca Square, Inc. All directors of the corporation lost their investment in, and ownership of, the property.

Hunt's action for breach of fiduciary duty is founded solely upon actions taken by the board of directors over his objections. While Hunt was not aware of the actual lease agreement being entered into, he was, by his own admission, aware at all time that negotiations for a new lease were underway and actively participated in those negotiations. The actions of which Hunt complains, the new lease agreement and decision to pay off outstanding obligations of the corporation rather than the mortgagee, *were management decisions of the board of directors and did not work to perpetrate a fraud on any stockholder.* No unfair transactions were undertaken which resulted in unjust

enrichment for Sampson or any other director. It appears from the record the board of directors was attempting a good faith effort to make what little they could out of a bad situation. They did what they thought was best for the good of the corporation and the stockholders involved. The trial court did not err in granting a directed verdict on this issue.

The appellants next contend the evidence was insufficient to support the award of actual damages. The appellants contend the only evidence of actual damages suffered by the plaintiff was $1,504 in attorney fees incurred in defending the two cases. The jury awarded $10,000 actual damages for each maliciously prosecuted case.

In *Nelson v. Miller*, 227 Kan. at 282, we stated the following damages were recoverable in an action for malicious prosecution:

"(a) the harm normally resulting from any arrest or imprisonment, or any dispossession or interference with the advantageous use of his land, chattels or other things, suffered by him during the course of the proceedings, and

"(b) the harm to his reputation by any defamatory matter alleged as the basis of the proceedings, and

"(c) the expense that he has reasonably incurred in defending himself against the proceedings, and

"(d) any specific pecuniary loss that has resulted from the proceedings, and

"(e) any emotional distress that is caused by the proceedings."

In order for the evidence to be sufficient to warrant recovery of damages there must be some reasonable basis for computation which will enable the jury to arrive at an approximate estimate thereof. *Venable v. Import Volkswagen, Inc.*, 214 Kan. 43, 50, 519 P.2d 667 (1974).

In addition to attorney fees, the plaintiff testified the lawsuits required a substantial amount of his time to answer and work on the lawsuits, and caused him a great deal of worry, loss of sleep, and emotional distress. The lawsuits also created a lien on his property in the amount of $170,000 during the pendency of the lawsuits which damaged his credit and greatly limited his ability to arrange financing. The second lawsuit was pending for almost two years before it was dismissed by Hunt. This evidence was sufficient to support the award of actual damages.

The appellants next contend the award of punitive damages was excessive and the trial court erred in refusing to order a remittitur of damages. The jury awarded $300,000 punitive

damages in each case, for a total of $600,000. The appellants contend this amount is excessive and disproportionate to the amount of actual damages suffered by the plaintiff.

In *Henderson v. Hassur*, 225 Kan. 678, 694, 594 P.2d 650 (1979), the following rules regarding punitive damages were stated:

"It is difficult, if not impossible, to lay down precise rules by which to test the question of when a verdict for punitive damages is excessive. *Motor Equipment Co. v. McLaughlin*, 156 Kan. 258, 273, 133 P.2d 149 (1943). Punitive damages are imposed by way of punishing a party for malicious or vindictive acts or for a willful and wanton invasion of another party's rights, the purpose being to restrain him and to deter others from the commission of like wrongs. *Koch v. Merchants Mutual Bonding Co.*, 211 Kan. 397, 402, 507 P.2d 189 (1973). The law establishes no fixed ratio between actual and exemplary damages by which to determine excessiveness. In assessing punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. Any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages. *Will v. Hughes*, 172 Kan. 45, 55, 238 P.2d 478 (1951). In fixing an award of punitive damages a jury may consider the amount of actual damages recovered, defendant's financial condition and the probable litigation expenses. *Ayers v. Christiansen*, 222 Kan. 225, 229, 564 P.2d 458 (1977)."

See also *Slough v. J. I. Case Co.*, 8 Kan. App. 2d 104, 111-12, 650 P.2d 729, *rev. denied* 232 Kan. 876 (1982). Also in *Cantrell v. R. D. Werner Co.*, 226 Kan. 681, 686, 602 P.2d 1326 (1979), it was stated:

"Where a charge of excessive verdict is based on passion or prejudice of the jury, but is supported solely by the size of the verdict the trial court will not be reversed for not ordering a new trial, and no remittitur will be ordered unless the amount of the verdict in light of the evidence shocks the conscience of the appellate court."

The appellants refer the court to *Slough* in support of their contention punitive damages are excessive. In that case actual damages were awarded in the amount of $55,500 and punitive damages in the amount of $350,000. Although the defendant company was worth $1,227,377,000, the Court of Appeals found the award to be excessive where the evidence showed there was no evil or malicious attitude displayed by the manufacturer and in fact it appeared it had attempted to help the plaintiff as best it could.

These types of mitigating circumstances are not present in the instant case. Substantial evidence was presented of the appellant

Hunt's malicious and wrongful conduct toward Sampson in previous years. Hunt himself testified in the Seneca Square case he had given a witness $3,000 to $4,000, a gold watch and a two-carat diamond ring to encourage him to "tell the truth." The jury heard testimony presented concerning the Bonanza, Inc., case where Sampson collected $120,000 in judgment and interest from Hunt for fraud and breach of fiduciary duty. Sampson testified he felt it would take an award of $1,000,000 punitive damages in each case to stop Hunt from harassing him with these types of lawsuits since the award of $120,000 in the Bonanza, Inc., case had not stopped him. A financial statement was introduced into evidence showing Hunt's net worth to be over $6,000,000. Furthermore, Sampson testified that after the Bonanza, Inc., case was concluded Hunt had told him that he "wasn't going to take losing a hundred plus thousand dollars laying down," and that he could also file lawsuits and "get even" in other ways.

The award of punitive damages here is 30 times the award of actual damages. The jury verdict shows they found the appellants guilty of maliciously prosecuting these claims against the plaintiff. The jury had before it and was entitled to consider the attending circumstances, the nature of the acts and the intent of the defendants, as well as any mitigating circumstances and Hunt's financial condition. Sampson testified he believed it would take at least a million dollars to stop Hunt's course of litigation against him. The jury obviously believed a large sum was necessary for that purpose. This amount is supported by the evidence. The trial court did not err in refusing to order a remittitur.

Accordingly, the judgment of the lower court is affirmed.

LOCKETT, J., not participating.