NOT DESIGNATED FOR PUBLICATION

No. 120,074

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SHARON K. BEICHLE and LARRY C. BEICHLE, Trustees of the SHARON K. BEICHLE TRUST
and the LARRY C. BEICHLE TRUST; TAMI PRESTON and JAY PRESTON; and LORI BLAIR,
*Appellees*,

v.

JOHN ROHRBOUGH and TYDD ROHRBOUGH,
*Appellants*.

MEMORANDUM OPINION

Appeal from Saline District Court; PAUL J. HICKMAN, judge. Opinion filed December 13, 2019.
Affirmed.

*Patrick J. Doran*, of Doran Law Office, of Kansas City, Missouri, for appellants.

*Derek S. Casey*, of Triplett Woolf Garretson LLC, of Wichita, for appellees.

Before MALONE, P.J., STANDRIDGE and WARNER, JJ.

PER CURIAM: The parties in this case are all members of the same family.
Plaintiffs Sharon Beichle, Tami Preston, and Lori Blair are sisters of defendant John
Rohrbough. Plaintiff Larry Beichle is married to Sharon Beichle. Plaintiff Jay Preston is
married to Tami Preston. Defendant John Rohrbough is married to Bernita Rohrbough,
but Bernita is not a party to this lawsuit. Finally, John and Bernita have an adult son
named Tydd Rohrbough, who is John's codefendant in this suit.

1

Following a bench trial, the district court granted judgment in favor of the Beichles and the Prestons (appellees) on their breach of contract and fraud claims, all of which arose from their financial dealings with John and Tydd (appellants). On appeal, the appellants raise several points of error and make a claim of insufficient evidence. For the reasons stated below, we affirm the district court's decision.

FACTS

In 2002, the appellants formed Cornhusker Energy Lexington, LLC (CEL) for the purpose of constructing and operating an ethanol plant near Lexington, Nebraska. They sought initial investments from family and friends. In October of that year, the appellees each agreed to invest $200,000, for a total of $400,000, into the newly formed company with the understanding that they would become members of CEL. The investment money was paid into CEL's US Bank account in Omaha, Nebraska, on October 11, 2002, and was held there, along with money from other sources, while the appellants attempted to raise additional funds to further capitalize the venture.

In 2003, the appellees both agreed to convert their equity investment in CEL to a debt secured by assets, including real estate, owned by CEL. Accordingly, on June 30, 2003, CEL executed two $200,000 promissory notes, one for the Prestons and one for the Beichles, and CEL secured each note with deeds of trust on real estate owned by CEL.

CEL continued to seek additional investors and, in 2004, ultimately found a number of private equity and venture capitalist firms willing to finance the ethanol operation. As a condition of that financing, however, the firms wanted to restructure CEL so that it became the operating company for the ethanol facility. CEL would then become a wholly owned subsidiary of a newly established Delaware holding company—Cornhusker Energy Lexington Holdings, LLC (CELH). The firms did not want the appellants' friends and family to remain involved in CELH, so they required CEL to

repay the $400,000 in loans made by the appellees under the June 30, 2003 promissory notes and established minimum eligibility requirements for future investors in CELH.

The appellees wanted to remain involved in the appellants' ethanol venture, but they could not qualify as accredited individual investors under the new minimum eligibility requirements. Because the minimum investment eligibility requirements for corporations were different than the requirements for an individual, CEL's attorney Brian Harr established an entity named Ludvig PBR, LLC, through which the appellees could invest in CELH. A business bank account in Ludvig's name was opened at Security National Bank in Omaha. To allow the appellees to reinvest, John told the appellees that as soon as they received the loan repayment from CEL, they immediately should transfer that money to the Ludvig bank account. There were no documents, records, or testimony introduced at trial to establish who held an ownership interest in Ludvig. Blair signed the company's operating agreement as the manager but said she did so because it would be a "conflict of interest" for the appellees to be the manager/signer on the account. Although Blair lived in Wichita, the mailing address on the account was identified as John's home address in Nebraska.

Around this same time period, Bernita called Blair and told her "that they had a spot for $20,000" in their ethanol venture if she was interested in investing. Blair said she was interested, and after that conversation she borrowed $20,000 from her local bank to fund her investment. Blair gave that money to her brother-in-law Jay and testified that she thought it was being directly invested into the appellants' ethanol venture. Like her siblings, however, Blair did not qualify as an accredited individual investor; therefore her money actually was deposited into the Ludvig bank account. Blair's bank records indicated that the transfer of funds was completed on October 28, 2004.

The restructuring of CEL was completed on October 29, 2004. In what has been described as a "perk" for being early investors in Cornhusker Energy, the restructuring

agreement provided the appellees each with 64,786 common ownership units in CELH. The restructuring agreement set aside 436,250 ownership units of CELH to Ludvig. The CELH operating agreement was signed by: (1) Tydd, individually and as trustee for three trusts; (2) John; (3) the Prestons; (4) the Beichles; and (5) Blair, as the manager of Ludvig.

The restructuring agreement included payments to the appellees to satisfy the June 30, 2003 promissory notes. The payments were scheduled for October 29, 2004, as part of the closing transaction, but the transfers were delayed due to circumstances beyond the parties' control. The appellees received the payoff on November 2, 2004, and, as instructed by John, they immediately wire transferred those funds into the Ludvig bank account. On November 3, 2004, a check for $436,250 was drawn from the Ludvig account. This check appears to represent Ludvig's payment for the ownership units in CELH that were set aside for the entity at the October 29, 2004 closing. The check purportedly was signed by Blair, but she denied issuing it.

On the same day as the closing, the appellants prepared and signed four $100,000 promissory notes, one for each of the appellees. Those promissory notes "contained the following provisions:

"a.   John Rohrbough and Tydd Rohrbough, individually, were the Makers, who undertook the obligation stated 'jointly and severally';

"b.   The Holders of the promissory note were Sharon K. Beichle and Larry C. Beichle as Trustees for the Sharon K. Beichle Trust [Sharon K. Beichle and Larry C. Beichle as Trustees for the Larry C. Beichle Trust; Jay Preston; and Tami Preston];

"c.   The principal amount of the promissory note was $100,000.00;

"d.   The promissory note bore interest at 25.00% per annum (not compounded);

"e.   The interest commenced on November 1, 2004;

4

"f.   No payment was due until the fifth anniversary of the note (October 29, 2009) or the sale of the assets, business, operations, or majority of outstanding units of CEL or CELH;

"g.   The Makers agreed to pay the Holders attorney's fees and costs to enforce the note; and

"h.   The note was governed by Nebraska law to be enforced in Dawson County, Nebraska."

The promissory note expressly stated that it was secured by a pledge agreement, which was executed on the same day as the note. That pledge agreement provided, in relevant part, as follows:

"THIS PLEDGE AGREEMENT (this 'Agreement') is made and entered into as of the 29[th] day of October, 2004, jointly and severally by John Rohrbough and Tydd Rohrbough (each a 'Pledgor' and collectively 'Pledgors'), for the benefit of Sharon K. Beichle and Larry C. Beichle, Trustees, and their successors, under [T]he Sharon K. Beichle Trust dated, Dec[ember] 5, 1999 [The Larry C. Beichle Trust dated December 5, 1999, Jay Preston, and Tami Preston] ('Secured Party').

"WITNESSETH:

. . . .

"WHEREAS, Secured Party has required, as one of the conditions to accepting the Note, that Pledgors grant Secured Party a security interest in the Collateral (as herein defined).

"NOW, THEREFORE, in consideration of the above premises and the covenants contained herein, the parties agree as follows:

"1. <u>Security Interest and Collateral</u>. To secure the payment and performance of each and every debt, liability and obligation of Pledgors to Secured Party under the Note (all such debts, liabilities and obligations being herein collectively referred to as the

5

'Obligations'), Pledgors hereby jointly and severally grants Secured Party a security interest (the 'Security Interest') in all of the issued and outstanding units of Ludvig PBR, LLC, a Nebraska limited liability company, owned by Pledgors (the 'Collateral').

"2. <u>Representations, Warranties and Covenants</u>. Pledgors each represent, warrant and covenant with Secured Party that:

a. Pledgor is the owner of his Units free and clear of all liens, encumbrances, security interests and restrictions;

b. Pledgor will keep his Units free and clear of all liens, encumbrances and security interests, except the Security interest; and

c. Pledgor will pay, when due, all taxes and other governmental charges levied or assessed upon or against his Units."

In late 2006, about two years after the promissory notes and pledge agreements were executed, the Beichles sought advice from their attorney, Eric Anderson, regarding their involvement in CELH and Ludvig. Anderson reviewed the documents that the Beichles provided to him and, on November 13, 2006, sent them a letter raising a number of questions and issues that he felt needed to be resolved. The most pressing of those were deficiencies in the October 29, 2004 promissory notes, including the fact that they failed to set forth a payment amount.

Anderson contacted the appellants in February 2007 to discuss his concerns. In that conversation, the appellants "confirmed that they were involved in the ethanol plant, that they had paid back some original notes to the Beichles and then the Beichles had re-loaned some money to them" and there were some promissory notes that had been signed. Anderson explained that he wanted to revise the notes on behalf of his client, primarily because there was no payment amount stated in them. Anderson drafted revised promissory notes as indicated and sent them to Brian Harr. The appellants ultimately agreed to revise the October 29, 2004 promissory notes so that (1) payment was due in full when the notes came due; (2) the 25% interest rate was compounded annually; (3) the notes would be subject to Kansas, not Nebraska, law; and (4) the forum selection clause

6

was changed from Nebraska to Kansas. The appellants also agreed to supplement the pledge agreement and personal guaranty by adding the following provisions:

"2. Term. This Agreement shall terminate upon payment of all amounts due and owing pursuant to the Note.

"3. Perfection of Security Interest. Pledgors shall execute and/or deliver to Holder at any time, and from time to time, at the request of the Holder, all agreements, instruments, documents, financing statements, and other written matter that Holder reasonably may request, in form and substance acceptable to Holder, to perfect and maintain Holder's perfected security interest, lien or encumbrance in, and assignment and pledge of the Collateral, and to consummate any transactions contemplated in or by this Agreement and other related agreements."

The appellants signed the revised promissory notes and pledge agreements, and the two documents were backdated to October 24, 2004.

In 2008, the appellants approached the appellees and asked if they would be willing to lower the interest rate and extend the term of the promissory notes because they could no longer afford the 25% interest rate. Both couples agreed to the changes and, in December 2008, the appellants signed another set of new promissory notes that contained the following key provisions:

"a.   The Makers of the notes are John Rohrbough and Tydd Rohrbough;
"b.   The Makers are jointly and severally obligated on the notes;
"c.   The Holders of the notes are the Sharon Beichle Trust[,] . . . the Larry Beichle Trust[, Jay Preston, and Tami Preston];
"d.   The principal amount of each note is $100,000.00;
"e.   The date of each note is October 24, 2004;
"f.   The interest on the notes accrues at 25.00% per annum, compounded annually from October 24, 2004, to October 31, 2008;
"g.   The interest on the notes accrues at 6.50% per annum, [w]ithout compounding, from November 1, 2008, until paid;

7

"h. The principal and interest are not due and owing until December 31, 2009, or the sale of the assets, business, operations or majority of outstanding units of CEL or CELH; and

"i. The Holders may recover their reasonable attorneys' fees and costs of litigation to enforce or collect the notes from the Makers, jointly and severally."

There is no evidence in the record that the promissory notes were paid, in full or in part, when the notes came due on December 31, 2009.

In 2010, Blair contacted the appellants and requested they return $5,000 from her $20,000 investment because she had fallen on hard times while taking care of her aging parents. At the time Blair made this request, the Ludvig bank account had a balance of only $55. Therefore, to cover Blair's payout, as well as a $2,000 payment to the appellees, the appellants withdrew $4,500 from an account held in the name of Rohrbough Racing Stables, an entity owned by John, and deposited that money into the Ludvig bank account. The appellants then used the deposited money to issue a $2,500 check to Blair, a $1,000 check to the Prestons, and another $1,000 check to the Beichles. A month later, the appellants completed a similar transaction from Rohrbough Racing Stables to the Ludvig account and, in turn, wrote another round of checks out of the Ludvig account to the Beichles, the Prestons, and Blair.

A few years later, Blair again fell on hard times and requested the return of her remaining $15,000 investment. John told Blair that they could not pay her because "the money was all gone."

On August 12, 2014, the appellees and Blair filed a lawsuit against the appellants. Each couple brought a breach of contract claim arising from the appellants' failure to pay the October 24, 2004 promissory notes, as amended in 2008, when they became due on December 31, 2009. Blair brought a fraud claim arising from the appellants' alleged misrepresentations and misuse of her $20,000 investment. In their answer, the appellants

denied the allegations made and raised a number of affirmative defenses. Relevant to this appeal, those defenses included an assertion that all of the claims pled were barred by the statute of limitations and that the appellees breach of contract claims were barred due to a lack of consideration. The case proceeded to a bench trial on February 15, 2017. The appellees, the appellants, Blair, Harr, and Anderson all testified to the facts set forth above. After hearing the evidence and the arguments of counsel, the district court took the matter under advisement. A month later, the parties submitted proposed findings of fact and conclusions of law.

In August 2018, the district court issued a memorandum decision and order granting judgment in favor of all three plaintiffs and against the appellants, jointly and severally, as follows:

"a.   For $297,223.96, with costs and attorney's fees, to remedy [the Rohrboughs'] breach of their promissory note made payable to The Sharon K. Beichle Trust;

"b.   For $297,223.96 with costs and attorney's fees, to remedy [the Rohrboughs'] breach of their promissory note made payable to The Larry C. Beichle Trust;

"c.   For $594,447.92 with costs and attorney's fees, to remedy [the Rohrboughs'] breach of their promissory notes made payable to Tami and Jay Preston;

"d.   For $15,000.00 with costs and interest to remedy [the Rohrboughs'] fraud against Lori Blair.

"e.   For $54,624.15 as recovery of their attorney's fees and costs as provided in the promissory notes as the Court has granted judgment in [the appellees'] favor on the merits."

In reaching its decision, the district court specifically rejected the appellants' affirmative defenses, finding that all of the claims pled were timely and that the breach of contract claims were supported by sufficient consideration.

ANALYSIS

On appeal, the appellants claim (1) the district court applied the incorrect legal standard to the breach of contract claims, (2) the contracts that were sued upon were not supported by sufficient consideration, (3) all of the claims against them were barred by the statute of limitations, (4) the district court improperly applied the alter ego doctrine to pierce the corporate veil, and (5) there was insufficient evidence to support the district court's ruling on the fraud claim.

1. *Legal standard for breach of contract claim*

The appellants argue the district court improperly relied on principles of securities law to enter judgment in favor of the appellees on their common-law breach of contract claims. Whether a district court applied the correct legal standard is a question of law and is therefore subject to unlimited appellate review. *Harrison v. Tauheed*, 292 Kan. 663, 672, 256 P.3d 851 (2011).

In Kansas, a claim for breach of contract requires: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 297 Kan. 2, 23, 298 P.3d 1083 (2013).

Here, the district court expressly and individually considered each of the five essential elements of a claim for a breach of contract in its analysis. Nonetheless, the appellants claim the district court improperly "relied heavily on securities law" in stating its legal conclusions. The appellants assert the district court's analysis is not supported by the applicable law and therefore the court's judgment in favor of the appellees must be reversed.

The appellants' argument focuses on paragraph 2 in the conclusions of law section of the district court's decision. In paragraph 2, the court commented that a promissory note could function as a security and therefore an investment. But when read in its entirety, the district court's memorandum decision makes clear that it did not rely on this comment in its analysis but instead applied breach of contract principles to resolve the claims. It appears the district court's comment relating to securities law was meant to address one of the appellants' primary defenses: There was no consideration for the promissory notes because the appellees provided their money as an investment in a limited liability company instead of providing the money directly to the appellants as a loan to fund the promissory notes. In fact, the appellants have insisted throughout the course of this litigation that a promissory note can only be a debt and never an investment. The district court's comment in paragraph 2 that promissory notes could be a security and, therefore, an investment, properly addresses the appellants' argument on that point.

The paragraphs immediately preceding and following the paragraph at issue support our conclusion that the district court properly limited its analysis to breach of contract principles. Paragraph 1 confirms that a promissory note is a contract. Paragraph 3 sets forth the elements required to prevail on a breach of contract claim. And there is no further reference to securities law in the memorandum opinion and order. In sum, we find the district court applied the proper legal standard to analyze the breach of contract claims here. See *Stechschulte*, 297 Kan. at 23.

2. *Consideration*

a. *The original promissory notes*

The appellants challenge the district court's finding that the original promissory notes were supported by consideration. A district court's findings of fact are reviewed

11

under a substantial competent evidence standard. Its conclusions of law based on those facts are subject to unlimited review. *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

A contract must be supported by consideration in order to be enforceable. *State ex rel. Ludwick v. Bryant*, 237 Kan. 47, 50, 697 P.2d 858 (1985). "'Consideration is defined as some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other.'" *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 32, 59 P.3d 1003 (2002) (quoting 17A Am. Jur. 2d, Contracts § 113, p. 129). Where, as here, the contract is in writing and was signed by the parties, the existence of consideration is presumed. Lack of consideration must therefore be raised as an affirmative defense and proven by substantial competent evidence. *Bryant*, 237 Kan. at 50.

In this case, the promissory notes were in writing and signed by the appellants, which gives rise to a presumption of sufficient consideration. At trial, the appellants attempted to overcome this presumption by arguing they never received any money, property, or other benefits in exchange for executing the promissory notes. The district court found the appellants failed to overcome the presumption of consideration. On appeal, the appellants assert the district court's decision is not supported by substantial competent evidence. Specifically, the appellants argue they received no benefit from the money transferred because the appellees transferred the money directly into the Ludvig bank account. Like the district court, we are not persuaded by the appellants' argument. Under the law of contracts, if the consideration given is otherwise sufficient to support a contract, it does not matter from or to whom the consideration is conveyed. *Boos v. National Fed'n of State High School Ass'ns*, 20 Kan. App. 2d 517, 525, 889 P.2d 797 (1995) (citing 17A Am. Jur. 2d, Contracts § 125). Therefore, the consideration may be given to the promisor or a third person. So even if, as the appellants argue, the money was not conveyed to them, consideration is sufficient if, in exchange for the appellants'

12

contractual promise, the consideration was conveyed to a third party, which in this case was Ludvig. The appellants induced the appellees to give up something of value (i.e., their money) by promising to repay them, with interest, at a later date. That the appellants, as the promisors, may not have directly benefitted from the promise they made is irrelevant to the question of whether there is sufficient consideration to support the contract.

More importantly, however, we are not persuaded by the appellants' claim that they did not benefit from the money transferred to Ludvig by the appellees. Specifically, there is evidence in the record that the appellants received a direct benefit from the transfer of money under the terms of the promissory note because the appellants had an ownership interest in Ludvig. Although not discussed by any party in the briefs on appeal, the record reflects that the appellants signed pledge agreements in conjunction with each of the promissory notes signed. To secure the payment and performance of the appellants' debt to the plaintiffs as set forth in the promissory notes, the pledge agreements expressly grant the plaintiffs a security interest in all of the issued and outstanding units of Ludvig owned by the appellants. In making this pledge, the appellants "each represent, warrant and covenant with Secured Party that he is the owner of his Units free and clear of all liens, encumbrances, security interests and restrictions" and that he will "keep his Units free and clear of all liens, encumbrances and security interests." Based on the appellants' representations, and in the absence of any evidence to the contrary, we necessarily conclude that each of the appellants held at least some ownership interest in Ludvig. Given this ownership interest, the appellants inevitably would have benefitted from the plaintiffs' deposit of cash into Ludvig's bank account.

    b. *The amended promissory notes*

Alternatively, the appellants argue that even if the promissory notes were supported by sufficient consideration in 2004, the amendments and restatements that

13

were made in 2008 were not. Specifically, the appellants assert a lack of consideration because the amended promissory notes were not supported by any "new money." In rejecting the appellants' argument, the district court found "[t]he amended and restated promissory notes are clearly amendments of the 2004 promissory notes and not evidence of a proposal for another investment by their terms" and thus supported by sufficient considerations.

We agree with the district court's finding that the amended and restated promissory notes are supported by the same consideration supporting the original promissory notes. And even if that were not the case, the facts here show that the appellants approached the appellees in 2008 to amend the promissory notes to reduce the interest rate and briefly extend the term of the notes. The amended promissory notes lowered the interest rate from 25% per annum to 6.5% reducing the appellants' annual interest obligation by 18.5% or $18,500 per note for a total savings of $74,000 per year after November 1, 2008. "Consideration is sufficient if there is a benefit to the debtor or an inconvenience or deprivation to the creditor, such as a promise by the creditor to refrain from legal proceedings or an extension of time within which the debtor may pay the creditor." *Ludwick*, 237 Kan. 47, Syl. ¶ 3. The appellants received a benefit in the reduction of interest and the extension of time to repay the obligation stated in the promissory notes.

In sum, we find substantial and competent evidence supports the district court's finding of sufficient consideration to support the original and the amended promissory notes.

3. *Statute of limitations*

The Rohrboughs argue the district court erred when it found that neither the breach of contract claims nor the fraud claim were barred by the statute of limitations. The statute of limitations is an affirmative defense meaning that the burden of pleading

14

and proving its applicability rests on the defendant. The burden of proving facts sufficient to toll the statute of limitations, however, rests with plaintiffs. *Hemphill v. Shore*, 295 Kan. 1110, 1123, 289 P.3d 1173 (2012). Finally, "the 'interpretation and application of a statute of limitations is a question of law over which an appellate court exercises unlimited review.'" *Garcia v. Ball*, 303 Kan. 560, 571, 363 P.3d 399 (2015).

a. *Breach of contract claims*

A promissory note is a written contract by which one party agrees to pay another party a sum of money. 144 Am. Jur. Proof of Facts 3d, 323 § 1; see *Mark Twain Kansas City Bank v. Cates*, 248 Kan. 700, 709, 810 P.2d 1154 (1991). The applicable statute of limitations, K.S.A. 60-511(1), provides that any action on a written contract must be brought within five years. Neither party disputes that the five-year statute of limitations applies to this case. Rather, their dispute is over when the statute of limitations began to run or, put another way, when the cause of action began to accrue. Under Kansas law, an action for breach of contract accrues when a contract is breached, irrespective of any knowledge on the part of the plaintiff or of any actual injury it causes. *Seaboard Corporation v. Marsh Inc.*, 295 Kan. 384, 388, 284 P.3d 314 (2012).

The promissory notes at issue in this case provided:

"No payments shall be due and owing until the earlier of: (a) December 31, 2009, or (b) sale of (i) substantially all of the assets, business or operations of Cornhusker Energy Lexington Holdings, LLC, a Delaware limited-liability company ('CEL Holdings'), or Cornhusker Energy Lexington, LLC, a Nevada limited liability company ('CEL'), or (ii) a majority of the outstanding units of CEL Holdings or CEL (the 'Payment Date'), at which time the [appellants] shall remit to the [appellees] the entire principal and accrued interest in one balloon payment, in accordance with the attached amortization schedule."

15

Under the terms of the contract, the promissory notes became due either on December 31, 2009 or on the Payment Date, whichever occurred first. There is no evidence in the record that CELH sold any assets or outstanding ownership units. Therefore, the statute of limitations on the appellees' breach of contract claims began to run on the date the promissory notes became due. See *Seaboard Corporation*, 295 Kan. at 388.

The appellants argue that the five-year statute of limitations began to run when the restructuring of CEL into CELH was finalized on October 29, 2004. Specifically, the appellants claim that the exchange of CEL ownership units for CELH ownership units constituted a "sale" of all of the outstanding CEL units, which triggered the promissory notes' "due-on sale" clauses. But the appellants' claim would require us to construe the "due-on-sale" clause to find that the promissory notes came due on the same day that they were issued and three days before they funded. Construing the clause in that way is unreasonable because it would undermine the very purpose of the promissory notes:  to fund the appellants' ethanol venture. See *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018) ("'The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided.'").

The statute of limitations for the breach of contract claims accrued on December 31, 2009, which is the date the appellants' breached their obligation to pay the promissory notes. See *Seaboard Corporation*, 295 Kan. at 388. The appellees brought their breach of contract claims on August 12, 2014, which was well within the five-year statutory period. See K.S.A. 60-511(1); *Pizel v. Zuspann*, 247 Kan. 54, 74, 795 P.2d 42 (1990).

b. *Fraud claim*

Under K.S.A. 60-513(a)(3), a claimant must bring a claim of fraud within two years of the fraud, but the claim "shall not be deemed to have accrued until the fraud is discovered." In turn, K.S.A. 60-513(b) provides that any claim under K.S.A. 60-513(a):

"shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."

In support of their claim that Blair's fraud claim was filed after the statute of limitations had run, the appellants allege (1) Blair's fraud claim is based on a phone call she received from Bernita in October 2004, (2) Blair invested her money later that month, (3) Blair did not inquire into the status of her investment until December 2013, (4) Blair filed her lawsuit alleging fraud on August 12, 2014. Based on these allegations, the appellants contend Blair reasonably could have discovered the facts supporting her fraud claim at any point after she invested her money in October 2004. Absent an explanation from Blair explaining why she failed to ask any questions about the status of her investment over this nine-year period, the appellants argue her fraud claim should be barred by the statute of limitations.

Whether a plaintiff's claims are barred by the statute of limitations is an affirmative defense. K.S.A. 2018 Supp. 60-208(c)(1)(P). Therefore, the defendant bears the burden of pleading and proving that a plaintiff's claims are barred by the statute of limitations. *Slayden v. Sixta*, 250 Kan. 23, 26, 825 P.2d 119 (1992). Applying these legal principles here, Blair does not bear the burden to show that her claim was filed within the statute of limitations. Instead, the appellants must prove that the statute of limitations

17

applies to preclude her claim. See 250 Kan. at 26; K.S.A. 60-513(a)(3). We find the appellants have failed to meet their burden of proof. The appellants fail to cite to any facts in the record to suggest that, before Blair asked for a full return on her investment in December 2013, she was actually aware, or through reasonable diligence could have been aware, that she had been the victim of a fraudulent investment scheme.

4. *Piercing the corporate veil*

The appellants argue the district court improperly applied alter ego principles to pierce the corporate veil and hold them individually liable on the two breach of contract claims and the fraud claim. The alter ego doctrine is used to impose liability on individuals who use a corporation as an instrument to conduct their own personal business. *Sampson v. Hunt*, 233 Kan. 572, 579, 665 P.2d 743 (1983). Under its strictures, the district court "disregards the corporate entity and holds the individual responsible for his [or her] acts knowingly and intentionally done in the name of the corporation." 233 Kan. at 579. Whether a district court applied the correct legal standard is a question of law and is therefore subject to unlimited appellate review. *Harrison*, 292 Kan. at 672.

a. *Breach of contract claims*

The appellants briefly argue that that the district court improperly applied the alter ego doctrine to pierce the corporate veil and hold them individually liable on the appellees' breach of contract claims. They base that argument on one paragraph in the findings of fact section of the district court's memorandum decision, in which it stated:

"[Ludvig's] bank records also show that the [appellants] comingled funds deposited by Lori Blair, the [appellees], and the [appellants]. The [appellees] and Lori Blair deposited a total of $430,770.14 into the account. Ludvig PBR paid $436,250.00 to CELH, presumably for the membership units outlined in the October 29, 2004, operating

18

agreement. There were no documents, records, or testimony to identify how many units of Ludvig PBR, LLC were issued or who the members of Ludvig PBR, LLC were."

But the appellees breach of contract claims were not, as the appellants assert, based on Ludvig's corporate conduct. Rather, they were based exclusively on the appellants' failure to pay the promissory notes that they prepared and signed as individuals. As such, the district court did not need to pierce the corporate veil, and in fact did not, to hold the appellants liable. See *Sampson*, 233 Kan. at 579 (explaining how and when alter ego doctrine should be used to pierce corporate veil).

b. *Fraud claim*

The appellants also argue that the district court improperly applied alter ego doctrine principles to Blair's fraud claim. Specifically, the appellants point to the district court's observation that Blair's investment was comingled with other funds to claim that it "imposed a much stricter standard of liability—one reserved for fiduciaries—to enter judgment against" them. As with the breach of contract claims, the appellants also assert that the district court improperly "pierced the corporate veil" to impute Ludvig's corporate conduct to them as individuals. But neither of these claims finds support in the record.

Although it is true that the district court mentioned the comingling of funds, it did so as an observation of what happened to Blair's $20,000 investment. At no point did it find that the appellants were Blair's fiduciaries nor did it hold the appellants to a fiduciary's stricter standard of liability.

Moreover, Blair's fraud claim is not in any way related to the corporate conduct of Ludvig. Instead, it is based on the misrepresentations that Bernita and the appellants made to Blair regarding her investment in their ethanol venture. Therefore, as with the

breach of contract claims, the district court did not pierce the corporate veil to hold the appellants liable on Blair's fraud claim. See *Sampson*, 233 Kan. at 579 (explaining how and when alter ego doctrine should be used to pierce corporate veil).

5. *Sufficiency of the evidence on fraud claim*

Finally, the appellants argue that there was insufficient evidence to support the district court's finding that Blair satisfied all of the elements necessary to support her fraud claim. When a verdict or district court decision is challenged for insufficiency of evidence or as being contrary to the evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witness. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the verdict will not be disturbed on appeal. *Gannon*, 298 Kan. at 1175-76.

To make a prima facie case for fraud, the burden is on the plaintiff to show, by clear and convincing evidence, that

> "(1) false statements were made as a statement of existing and material fact; (2) the representations were known to be false by the party making them or were recklessly made without knowledge concerning them; (3) the representations were intentionally made for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations made; and (5) the other party sustained damage by relying on them." *Kelly v. VinZant*, 287 Kan. 509, 515, 197 P.3d 803 (2008).

The district court held that Blair met her burden. Specifically, the district court found that Blair had proved Bernita knowingly made false representations to Blair for the purpose of inducing Blair to act, that Blair did act, and that, as a result, Blair suffered damages. In doing so, the district court implicitly attributed Bernita's statements to be representations made by the appellants. On appeal, the appellants do not contest that

20

Bernita knowingly made representations to Blair nor do they contest that those representations induced Blair to act in a way that resulted in the loss of $15,000. Instead, the appellants argue there was insufficient evidence to support the district court's findings that Bernita's actions and representations were: (1) attributable to the appellants and (2) false.

a. *Attribution*

The common-law doctrine of agency "recognizes three distinct bases on which the legal consequences of the agent's action are attributable to the principal—actual authority, apparent authority, and respondeat superior." *Golden Rule Ins. Co. v. Tomlinson*, 300 Kan. 944, 956, 335 P.3d 1178 (2014). Of those, only apparent authority is relevant here. Apparent authority exists if "'a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'" 300 Kan. at 956. Apparent authority does not presuppose the existence of a prior or present agency relationship, which means that "an actor who appears to be an agent but is not may nevertheless bind a principal in certain instances." 300 Kan. at 956.

The appellants argue that there was insufficient evidence to support the district court's implicit finding that Bernita was acting as their agent when she made representations to Blair about investing in CELH in 2004. But this argument is not supported by the record. Blair testified that when Bernita called her in 2004, "she stated that they had a spot for $20,000.00 if [Blair] wanted in." Bernita did not specify who "they" were or what the "spot" was, but Blair testified that she was certain that it referred to the appellants' ethanol venture. That certainty was grounded in previous conversations that Blair had with her siblings regarding the ethanol venture and the money that they hoped to make from it. Blair's testimony supports the district court's implicit finding that Blair reasonably believed Bernita had authority to act on behalf of the appellants and that

21

her investment is traceable to the appellants' actions. See *Golden Rule Ins. Co.*, 300 Kan. at 956. Viewed in a light most favorable to Blair, there was sufficient evidence to support the district court's implicit finding that Bernita was acting as the appellants' agent and, therefore, her conduct was attributable to them. See *Gannon*, 298 Kan. at 1175-76.

b. *Falsity*

The appellants argue there is insufficient evidence to support the district court's finding that the representations Bernita made on the phone in 2004 were false. Specifically, the appellants claim that Blair's lack of knowledge regarding what happened to her $20,000 after she gave it to her brother-in-law Jay does not mean that her funds were never invested as proposed. But this argument improperly asks this panel to reweigh the evidence and redetermine questions of fact that were already decided by the district court, something this panel cannot do. See *Gannon*, 298 Kan. at 1175-76. Further, it ignores the bank statements and other documentary evidence that show how Blair's funds were actually used and, in particular, show where the money came from when she requested a partial payout of her investment in 2010. When that evidence is viewed in a light most favorable to Blair, it is more than sufficient to support the district court's conclusion that Bernita's representations to Blair during the 2004 phone call were, in fact, false. See *Kelly v. Vinzant*, 287 Kan. 509, 515, 197 P.3d 803 (2008).

Affirmed.